## CERRO METAL PRODUCTS

v.

## Ray MARSHALL.

## FLECK INDUSTRIES, INC.

v.

## Ray MARSHALL.

## Civ. A. Nos. 78–3713, 79–77.

United States District Court,
E. D. Pennsylvania.

March 8, 1979.

Arlen Specter, Philadelphia, Pa., for plaintiffs.

Matthew J. Rieder, Dept. of Labor, Philadelphia, Pa., for defendant.

POLLAK, District Judge.

These two cases, *Cerro Metal Products v. Marshall*, No. 78–3713, and *Fleck Industries, Inc. v. Marshall*, No. 79–77, are entirely separate lawsuits, but they present a common question of law. For that reason, they have been consolidated for argument and are dealt with together in this opinion.

The question of law linking the cases is rooted in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), which considered the validity of a key enforcement provision of the Occupational Safety and Health Act of 1970. 29 U.S.C. § 651, *et seq.* That Act vests in the Secretary of Labor, as statutory head of the Occupational Safety and Health Adminis-

tration (OSHA), broad powers and responsibilities to reduce hazards to life and health in the working environment of over sixty million people employed in enterprises affecting interstate commerce. "In order to carry out the purposes of this chapter, the Secretary is authorized," by Section 8(a), "to enter without delay and at reasonable times . . . and . . . to inspect and investigate during regular working hours and at other reasonable times," 29 U.S.C. § 657(a), the upwards of five million workplaces throughout the nation which are covered by the Act. The Supreme Court in *Barlow's* held Section 8(a) "unconstitutional insofar as it purports to authorize inspections without warrant or its equivalent . . . ." 98 S.Ct. at 1827. Based upon this holding, the Court affirmed the decree of a three-judge District Court enjoining Secretary Marshall from carrying out warrantless inspections.

I.

*Cerro Metal Products v. Marshall*

*Cerro Metal Products v. Marshall* is, chronologically, the first of the two cases now before this Court. It had its beginnings in September of 1978—four months after the decision in *Barlow's*—when an employee of Cerro Metal Products was killed at the Cerro plant in Bellefonte, Pennsylvania. Advised of the fatal accident, an OSHA inspector presented himself at the plant that very day: he appears to have been admitted at once, without a warrant; and he thereupon spent the balance of that day and the next day on the premises. During October, (1) an OSHA citation issued alleging a violation of the Act; (2) Local 1282 of the United Auto Workers (the local union which is the certified collective bargaining representative of Cerro's employees) complained to OSHA about other alleged safety and/or health hazards; and (3) relations between Cerro management personnel and OSHA field officers became increasingly strained and mistrustful. At the beginning of November, the OSHA inspector who had been at the plant in September notified Cerro that he intended to

conduct further inspections five days a week for three or four weeks. Cerro management indicated that the inspections would be assented to only subject to certain conditions, (a) relating to scope and probable cause, and (b) including an understanding that a Cerro industrial hygienist would accompany OSHA's industrial hygienist throughout the inspections. These conditions were entirely unacceptable to OSHA. When Matthew Rieder, Esq., a staff attorney for OSHA, advised Cerro personnel that OSHA would seek an *ex parte* warrant on November 6, 1978, Cerro, on the morning of November 6, 1978, launched its own preemptive strike—initiating this equity proceeding against Secretary Marshall, Regional Administrator Rhone, and Mr. Rieder. The gravamen of Cerro's complaint was that (1) the extended inspection planned by the OSHA field staff was unjustified because it was part of a pattern of OSHA harassment of Cerro; (2) OSHA personnel hoped to gather evidence of crime through the subterfuge of resort to civil process; and (3) OSHA in any event had no authority to seek an inspection warrant *ex parte*. Accordingly, Cerro sought a decree enjoining the defendants from trying to obtain a "broad-ranging search warrant" as an instrument of (1) agency harassment, or (2) subterfuge; and Cerro also (3) asked that defendants be enjoined from seeking any inspection warrant without giving plaintiff such notice as would permit it to appear and oppose OSHA's demand for compulsory inspection process.

On November 9, 1978, I heard argument on plaintiff's request for a temporary restraining order. On the following day, I ruled from the bench on that request:

(1) I did not formally dispose of plaintiff's claim that OSHA's intention to undertake additional and in-depth inspections was in a dual sense an abuse of process ([1] part of a pattern of harassment; [2] a search for evidence of crime under the guise of civil process). But in my bench opinion I indicated serious doubt that plaintiff could, if put to full proof, prevail on either theory.

(2) I did conclude, however, that, although I regarded the matter as "not wholly free from doubt," plaintiff Cerro was right in its contention that Secretary Marshall and his subordinates lacked authority to seek an inspection warrant *ex parte*. My holding rested on my reading of Justice White's opinion for the court in *Barlow's* —an opinion which is itself at certain points responsive to, if not fully acquiescent in, submissions made to the Court with respect to OSHA's enforcement procedures by former Secretary Usery (in OSHA's jurisdictional statement) and incumbent Secretary Marshall (in OSHA's brief on the merits). Justice White, in demonstrating that a constitutional mandate to proceed by warrant would not seriously hamper the Secretary in the fulfillment of his enforcement responsibilities, noted that 29 CFR § 1903.4 [1] (hereinafter referred to as "Section 1903.4": a regulation implementing Section 8(a) adopted by the Secretary in 1971 and still in force when *Barlow's* was decided) itself contemplated that, where an OSHA inspector was denied entry, the inspector's superiors would take "appropriate action, including compulsory process, if necessary." In my bench opinion, I then went on to quote (with interstitial comments) the next fol-

1. "Upon a refusal to permit a Compliance Safety and Health Officer, in the exercise of his official duties, to enter without delay and at reasonable times any place of employment or any place therein, to inspect, to review records, or to question any employer, owner, operator, agent, or employee, in accordance with § 1903.3 or to permit a representative of employees to accompany the Compliance Safety and Health Officer during the physical inspection of any workplace in accordance with § 1903.8, the Compliance Safety and Health Officer shall terminate the inspection or con-

fine the inspection to other areas, conditions, structures, machines, apparatus, devices, equipment, materials, records, or interviews concerning which no objection is raised. The Compliance Safety and Health Officer shall endeavor to ascertain the reason for such refusal, and he shall immediately report the refusal and the reason therefor to the Area Director. The Area Director shall immediately consult with the Assistant Regional Director and the Regional Solicitor, who shall promptly take appropriate action, including compulsory process, if necessary."

lowing sentences in Justice White's opinion—sentences which, as I understood them, reflected the Supreme Court's reading of Section 1903.4 as meaning not merely that the Secretary would, where entry is refused, seek an inspection warrant ("compulsory process"), but that the request for the warrant would itself be with notice to the proprietor whose premises were sought to be inspected (98 S.Ct. at 1823–24; footnotes omitted):

> The regulation represents a choice to proceed by process where entry is refused; and on the basis of evidence available from present practice, the Act's effectiveness has not been crippled by providing those owners who wish to refuse an initial requested entry with a time lapse while the inspector obtains the necessary process. Indeed, the kind of process sought in this case and apparently anticipated by the regulation provides notice to the business operator. If this safeguard endangers the efficient administration of OSHA, the Secretary should never have adopted it, particularly when the Act does not require it. Nor is it immediately apparent why the advantages of surprise would be lost if, after being refused entry, procedures were available for the Secretary to seek an *ex parte* warrant and to reappear at the premises without further notice to the establishment being inspected.

From the foregoing (and from language of similar tenor in footnotes to Justice White's opinion), I deduced that the Court majority had found that under his own existing regulations the Secretary did not have the arrow labeled "*ex parte* warrant" in his quiver. I noted that the Secretary could, if he now deemed such authority essential, acquire it with relative ease by undertaking to amend Section 1903.4. But I concluded that, in the meanwhile, the Secretary—like other high officials of the executive branch—owed it to those he governed to abide by his own regulation.[2] Whereupon, I entered a temporary restraining order directing Secretary Marshall and the other defendants not to seek an inspection warrant without giving due notice to plaintiff.

On November 27, 1978, I entered a preliminary injunction in the same vein as the temporary restraining order, and based on the grounds recited from the bench on issuance of that order.

On December 28, 1978, the Secretary and the other defendants filed a motion asking that the preliminary injunction of November 27 be dissolved or modified "so that it shall have no prospective effect to prohibit defendants from seeking an *ex parte* inspection warrant . . . .." The ground for the motion was the publication in the Federal Register, on December 22, 1978, by Dr. Eula Bingham, Assistant Secretary of Labor, of an amended Section 1903.4. The amended regulation, which was filed with the Federal Register on December 21 to take effect on December 22, provides, *inter alia*, that "For purposes of this section, the term compulsory process shall mean the institution of any appropriate action, including *ex parte* application for an inspection warrant or its equivalent." The Federal Register for December 22 contains not only the amended Section 1903.4 but, introducing the text of the amended regulation, certain expository materials which undertake to explain at some length the reasons for the amendment. The introductory materials include the following "Summary":

> This amendment to 29 CFR 1903.4 clarifies the existing regulation respecting the legal action to be taken to permit inspection of a workplace over an employer's objection. Specifically, the revised regulation makes it clear that the term "compulsory process" as used in the regulation has been, and is, intended to include all legal action necessary to secure entry to the workplace, including *ex parte* application for an inspection warrant or its equivalent. The amendment also makes plain that compulsory process, as so defined, may be secured prior to an employer's objection to an inspection or in-

---

2. See *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 546–47, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

vestigation. The procedures for taking appropriate action to obtain entry have also been modified to promote administrative convenience.[3]

Supporting the defendants' motion to dissolve or modify the preliminary injunction is UAW Local 1282, which, as the certified bargaining representative of Cerro's employees, has been granted leave to intervene as a party defendant.[4]

Plaintiff opposes defendants' motion to dissolve or modify the preliminary injunction, contending that the December 22, 1978, amendment of Section 1903.4 is, notwithstanding its unambiguous language and purpose, ineffective to authorize defendants to seek inspection warrants *ex parte.* In plaintiff's view, the amended regulation is invalid because it was promulgated hastily and unilaterally, in a manner which does not conform to the rule-making procedures specified in the Administrative Procedure Act. 5 U.S.C. § 551 *et seq.* Specifically, Cerro argues that pursuant to the Administrative Procedure Act (5 U.S.C. § 553), the Secretary was required to give at least thirty days notice, with opportunity for comment, with respect to his proposed new Section 1903.4, before putting it into effect. The Secretary contends that the revision of Section 1903.4 was not subject to this requirement because it falls within the exemption established by 5 U.S.C. § 553(b)(A) for an "interpretative rule, general statement of policy, or rule of agency organization, procedure or practice."

## II.

*Fleck Industries, Inc. v. Marshall*

The second of the cases consolidated for argument and opinion is *Fleck Industries, Inc. v. Marshall.* On January 9, 1979, Fleck Industries brought suit to enjoin Secretary Marshall and other OSHA officials from seeking an *ex parte* warrant to inspect plaintiff's plant at Willow Grove, Pennsylvania. Plaintiff alleged that it had permitted one inspection, and had agreed to a further inspection as soon as a particular industrial operation was to be repeated. But, so plaintiff alleged, OSHA intended to make other and unrelated inspections which plaintiff would not consent to because they were lacking in probable cause. Fleck's suit was intended to insure that defendants would not secure an inspection warrant without according Fleck an opportunity to demonstrate, before the magistrate or judge from whom a warrant might be sought, that OSHA's asserted reasons for the proposed additional inspections were insubstantial. Fleck sought a temporary restraining order, and subsequent injunctive relief, modeled on the preliminary injunction entered in favor of plaintiff in *Cerro Metal Products v. Marshall, supra,* on November 27, 1978.

Defendants contended that no temporary restraining order could properly issue. In essence, defendants' position was and is: (1) *Cerro* was wrongly decided; and (2) even if, *arguendo,* a preliminary injunction was plausibly proper in *Cerro* on November 27, 1978, the December 22 amendment of Section 1903.4 undercut any residual claim to doctrinal authority the *Cerro* opinion had in *Cerro* itself, let alone as precedent for any other lawsuit. But the plaintiff in *Fleck* regards defendants' reliance on amended Section 1903.4 as unavailing, for the reasons advanced by plaintiff in *Cerro.*

Thus, *Fleck* seems to present the same question of law posed by the Secretary's motion to dissolve or modify the *Cerro* injunction—namely, whether amended Section 1903.4 has effectively replenished the Secretary's *ex parte* warrant armory, to the

---

3. The full text of the introductory materials, and the amended regulation, are set out in Appendix A.

4. UAW Local 1282 argues that the *Cerro* injunction has forced the Secretary to choose between (1) safeguarding plaintiff's employees by inspecting plaintiff's plant, and (2) preserving for appeal the issue decided against the

Secretary in *Cerro.* But it is by no means clear that this cruel choice is in fact presented. Since the injunction is not limited to a single inspection, it would appear that the Secretary could have sought compulsory process with notice to the plaintiff without rendering the injunction moot.

extent that it may have been depleted by my rulings in *Cerro.* Since the question of law is one of first impression, and arises in a setting with which I have become somewhat familiar, via the opening phases of *Cerro,* I agreed with my colleague, Judge Hannum, to whom *Fleck* had been randomly assigned, that there would be some saving in judge-time if I accepted a transfer of *Fleck* from his docket to mine.[5] Thereupon, the parties agreed that the argument and disposition of the *Fleck* application for a temporary restraining order could be postponed to permit consolidation with the Secretary's motion to dissolve or modify the *Cerro* injunction.

### III.

### A.

In the Secretary's[6] Reply Memorandum in support of his motion to dissolve or modify the *Cerro* injunction,[7] it is argued, with respect to the proper construction of Section 1903.4 in its pristine form, "that compulsory process, whether by warrant or equivalent process, was always intended by the agency to be *ex parte* in nature." P. 4. That the OSHA field staff may frequently have sought inspection warrants *ex parte* there seems no reason to doubt.[8] But there plainly was no uniform practice to that effect. In the very case which came before the Supreme Court in *Barlow's,* after Ferral G. "Bill" Barlow refused to let OSHA Com-

pliance Officer Sanger conduct a routine inspection of his Pocatello plumbing and heating installation business, the Secretary filed with the District Court in Boise an "Application for Affirmative Order to Grant Entry and for an Order to show cause why such affirmative order should not issue." Thereafter, an adversary hearing was conducted; and in due course there issued the "Affirmative Order" sought by the Secretary. *Barlow's, Inc. v. Usery,* 424 F.Supp. 437, 439 (D.Idaho 1976). Thus was the stage set for Ferral G. "Bill" Barlow's application for the three-judge court in which he challenged—successfully, in the event—the Secretary's assertion that the Act contemplated warrantless inspections and, so construed, was constitutional. Thus, it was against this background that Justice White, in developing the proposition that a constitutional rule requiring a warrant would not significantly impede OSHA enforcement, pointed out that Section 1903.4 itself embodied an administrative election to go to court for "compulsory process" where entry was refused. The Justice's point was that there was no evidence that the Secretary's decision to enlist judicial back-up for inspections had created enforcement difficulties, notwithstanding that "the kind of process sought in this case and apparently anticipated by the regulation provides notice to the business operator." 98 S.Ct. at 1823. That this was in no sense a casual observation is apparent from

---

**5.** In fact, as my Memorandum of January 18, 1979 sets forth in some detail, *Fleck* was initially assigned to me as a case "related" to *Cerro,* within the meaning of Local Rule 3. Concluding that the relatedness was one of law, not of fact, and hence outside the scope of Rule 3, I returned *Fleck* to the Clerk's Office. Random assignment then sent *Fleck* to Judge Hannum; thereafter, he and I agreed (with Chief Judge Lord's approval) that it would be sensible to transfer the case to me.

**6.** For the balance of this Opinion, the term "the Secretary" shall be taken to refer to the defendants, taken as an aggregate, in both cases. The group of named defendants in *Fleck* is not, to be sure, exactly congruent with the group of named defendants in *Cerro.* But all defendants in both cases are sued as OSHA officials; and, since Secretary Marshall is the principal foe of each plaintiff, he probably won't mind being

treated, syntactically, as the apotheosis, or at least as the surrogate, of his subordinate co-defendants in both cases.

**7.** The Reply Memorandum may also be taken as stating the Secretary's legal position in *Fleck* on the question of law shared by the cases.

**8.** The Secretary has cited cases decided subsequent to the *Barlow's* decision in which courts have approved what appear to be *ex parte* warrant applications. See, e. g., *In the Matter of Establishment Inspection of Gilbert & Bennett Manufacturing Co.,* No. 77–C–856 (7th Cir., January 2, 1979); *Casteel v. Marshall,* No. 78–1770 (7th Cir., December 20, 1978). These cases did not, however, consider the effect of Section 1903.4 as a self-imposed limitation on the Secretary's authority.

the sentences immediately following: "If this safeguard endangers the efficient administration of OSHA, the Secretary should never have adopted it, particularly when the Act does not require it." *Id.* at 1823–24. Driving the point home, Justice White made it clear that if petitioning for a warrant *with notice*, as in *Barlow's*, would rob the Secretary of the important enforcement leverage of surprise, he could change his mode of operation so that, "after being refused entry, procedures were available for the Secretary to seek an *ex parte* warrant and to reappear at the premises without

further notice . . . ." *Id.* at 1824. In order to accomplish this, Justice White indicated that what the Secretary would have to do—but all he would have to do—would be to change his own regulations: "Insofar as the Secretary's statutory authority is concerned, a regulation expressly provided that the Secretary could proceed *ex parte* to seek a warrant or its equivalent would appear to be as much within the Secretary's power as the regulation currently in force and calling for 'compulsory process.'" *Id.* at n. 15.[9]

9. Of course the term "compulsory process" does not have to connote adversary process. But in adopting this conventional understanding of the term, Justice White and his colleagues of the majority were certainly entitled to rely not only on the *Barlow's* record but, far more significantly, on what the Secretary had said, in his submissions to the Court about Section 1903.4, pointing out, e. g., that it "is commonly the case in civil warrant practice [that] a show cause order issues before compulsory process may be obtained," *Marshall v. Barlow's, Statement as to Jurisdiction*, p. 11, and that, if the Court were to adopt the Secretary's view that there was no constitutional need for a warrant, "since the district courts are always open for compulsory process purposes, Fed.R.Civ.P. 77(a), and there would ordinarily be no cognizable contention in opposition, orders authorizing entry would issue swiftly and routinely in the event of refusals . . . ." *Id.* at n. 13. See also pp. 34, 39–40, and *id.* at n. 20 of the Secretary's Brief in *Marshall v. Barlow's, Inc.*

This continued to be the Secretary's position at oral argument and that the Justices so understood it appears from two colloquys between the Solicitor General and various members of the Court:

QUESTION: And what does the regulation say about it?

MR. McCREE: Well, the Secretary has adopted a regulation that provides, in summary, that the Area and Assistant Regional Director and the Regional Solicitor shall promptly take appropriate action, including compulsory process, if necessary.

Now, as a matter of practice, the Regional Inspectors have then gone to the court to obtain an order requiring the proprietor to submit to the inspection. And, indeed, that was done here. On the 30th of December, the District Court to which the application was made, after issuing an order to show cause to which Barlow's responded with counsel, issued an order requiring entry for the purpose of inspection.

QUESTION: What does the United States—What does the inspector submit to the court to get such an order? Does he just make the presentation such as you did, that there is a reasonable inspection scheme and the statute permits it and we want to get in?

MR. McCREE: That is essentially the representation he makes to the court. And the court in this case issued an order to show cause which permitted the employer to appear and assert any objection he might have.

QUESTION: So that it is more than the equivalent of a search warrant if you could have gotten a search warrant for this reason?

MR. McCREE: Considerably more, because it is an adversary proceeding and the search warrant, of course, is *ex parte*. (Transcript of argument at 7–8)

* * * * * *

QUESTION: Mr. Solicitor General, it seems to me that the Secretary here by his regulations has indicated that "We will just give him notice," and he has instructed his inspectors, "If refused entry, don't break in and take advantage of an unannounced entry. Go to court."

MR. McCREE: If the Court please, he first instructs his inspector to seek entry, without notice—

QUESTION: I know, but then he permits him to be turned away and tells him if he is turned away to go to court.

MR. McCREE: If the Court please, there are regulations which forbid giving advance notice of the intent to inspect, and there are even penalties on the employees for disclosing the intention of inspecting. So it's really not its purpose. The regulation, as the Court appropriately points out, does afford notice once the court is asked to issue such an order. That is the rare case. That is the case where he has been turned down and we hope this Court's ruling today will make it unnecessary to do it. (*Id.* at 41)

Moreover, to the extent that it is relevant, this understanding of the meaning of "compulsory process" was shared by the respondent, through its counsel, John L. Runft, Esq.:

Of course, Justice White's interpretation of Section 1903.4 in *Barlow's* was, technically, dictum. But it was dictum integral to the constitutional holding announced by the Justice on behalf of the Court majority.[10] Under such circumstances, I do not regard it as the province of a District Judge to undertake to overrule the Supreme Court.

## B.

The Secretary argues that I am entitled, and indeed obligated, to regard myself as freed from the strictures of the *Barlow's* opinion by force of his more recently articulated interpretation of Section 1903.4. The interpretation on which the Secretary relies is (1) his new Section 1903.4—signed by Assistant Secretary Bingham on December 15, 1978, filed with the Federal Register on December 21, and published to take effect on December 22—which defines "compulsory process" to "mean the institution of any appropriate action, including *ex parte* application for an inspection warrant or its equivalent," 43 FR 59839, coupled with (2) his official "Summary" of the new Section 1903.4, which recites "that the term 'compulsory process' as used in the regulation *has been*, and is, intended to include all legal action necessary to secure entry to the workplace, including *ex parte* application for a warrant or its equivalent." *Id.* at 59838 (emphasis added).

Given that the Secretary has, as of December 22, 1978, formally announced not merely that thereafter he will construe Section 1903.4 to include *ex parte* warrants but also that *theretofore* the regulation "has been . . . intended to include" such process, am I required to ignore the Supreme Court's contrary understanding of the regulation with respect to events prior to December 22, 1978? In insisting that the answer to this question is in the affirmative, the Secretary points to the language of the Court of Appeals for the Fifth Circuit, *Roy Bryant Cattle Co. v. United States*, 463 F.2d 418, 420 (5th Cir. 1972), quoted approvingly by our own Court of Appeals in *Budd v. Occupational Safety & Health Review Commission*, 513 F.2d 201, 205 (3d Cir. 1975), which assigns "controlling weight" to an agency interpretation of its own regulations "as long as it is one of several reasonable interpretations."

If the Secretary were simply contending, in a matter of first judicial impression, that a recently formulated broad interpretation of one of his own regulations should be controlling, notwithstanding that on some prior occasions he or his predecessors seem to have read the same regulation more narrowly, the latter-day interpretation he would be relying on might seem, on the authority of *Budd, Roy Bryant Cattle Co.*, and kindred cases, entitled to great and perhaps even compelling authority. In such a case, the Secretary's submission would bring him within the range of considerations which entitles an administrator's own construction of his governing statute or

QUESTION: Mr. Runft, one is *ex parte* and the other is not. What you are asking for is an *ex parte* hearing before a magistrate.
MR. RUNFT: That is correct, Your Honor. The reason there, Justice Marshall, if I may say, is that in the *ex parte* hearing there is still the requirement that they must make a probable cause showing. They still must conform to these standards.
QUESTION: And you could then suppress, move to suppress.
MR. RUNFT: One could move to quash the warrant later.
That does bring up another interesting question, or another issue which is apparent throughout the brief here of the Government, and that is they say that the Government would be terribly disadvantaged if it was faced with a warrant requirement.

Now would it, really? They claim that it would give notice to the employers that there would be a search; but, indeed, doesn't the present compulsory process give notice just as much as a warrant would. In fact, a warrant would give less notice if you followed an *ex parte* obtaining of a warrant. (*Id.* at 25). See also Respondent's Brief at 47.

10. Justice Stevens, joined by Justices Blackmun and Rehnquist, took sharp issue with the constitutional ruling announced by Justice White. But there is no indication that they quarreled with the Justice's exposition of Section 1903.4, except that they did not read its relevance to the constitutional issue in the same light as the majority did. See 98 S.Ct. at 1829–30.

regulations to substantial judicial respect when a court is called on to perform what is the ultimate and inescapable "duty of the judicial department to say what the law is." *Marbury v. Madison,* 1 Cranch (U.S. 1803) 137, 177, 2 L.Ed. 60; *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In *Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946), in language quoted in *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), the Court observed: "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."

In the cases at bar, however, the Secretary seems to contend that his recently promulgated interpretation should displace "the result [the Justices] have reached" on a "question [which has] arisen in the first instance in judicial proceedings." The contention is one which presents a leader of the executive branch in the unaccustomed role of reviser of Supreme Court doctrine. It is

not surprising that the Secretary has not advanced any case authority for the proposition that the lower federal courts should give greater weight to law announced by the Secretary than law announced by our highest Court.

If the Secretary were able (a) to issue a regulation which purported to overrule an inconsistent judicial ruling, and (b) to insist that the *ex post* administrative interpretation was entitled to "controlling" weight (*Budd, supra*) with retrospective force, the finality and independence of judicial action would be in jeopardy. In republics built on legislative supremacy, the notion that the legislature (or the executive, as its agent) can overturn judicial determinations appears to be tolerated. As recently as 1972, for example, when a court in Northern Ireland held that a 1920 statute of Parliament required a dismissal of a criminal prosecution, the Government, rather than seeking to change the result on appeal, prevailed on Parliament to pass a new statute declaring that the 1920 statute "shall not have effect, and shall be deemed never to have had effect," to require the result judicially declared.[11] In the United

11. See the Northern Ireland Act 1972, 42 *Halsbury's Statutes of England* [1972] 1404–05. The episode is described in Bromhead, *The British Constitution in 1972,* 26 *Parliamentary Affairs,* 128, 142 (1973) footnotes omitted):

From 1969, when the army had been sent to Northern Ireland to support the civil power, it had been assumed that it would operate under powers conferred on it by the Special Powers Act. On the morning of 23rd February the Northern Ireland High Court delivered a judgment which found that a regulation made under the Special Powers Act, empowering an officer of the Army to require an assembly of persons to disperse, was ultra vires; and thus in effect that other regulations made on the same basis were ultra vires in so far as they conferred powers on the armed forces—for example, to stop and search people and vehicles. The Government of Ireland Act, 1920, expressly denied the Northern Ireland Parliament the power of making laws respecting the armed forces; therefore, it was reasoned, the Northern Ireland Government had no authority to confer powers on the army under the Special Powers Act. The Government calculated that it could not take the time for appeal to the House of Lords, so at 3:30 p. m. on the same

day the Home Secretary made a statement to the effect that a Bill would be brought in "to declare that the law so far as the powers of the Armed Forces are concerned is and has always been what it has hitherto been believed to be."

The Bill had a retrospective effect, but only "in order to re-create a situation which we all thought existed." At 7 p. m. a motion for leave to bring in this "declaratory" Bill was introduced, and approved after just over three hours' debate. The Second Reading was passed without debate or division; the Committee stage was taken immediately, and at 11:25 the Report and third Reading stages were concluded without debate or division. At 11:38 the sitting was suspended while the Lords took the Bill through all its stages in 2¼ hours. At 2:11 a. m., fifteen minutes after the Lords third reading, the Royal Assent was signified, seven hours after the Bill's introduction and some sixteen hours after the occasion for the Bill had arisen.

It should be noted that, while "[t]he Act [was] retrospective . . . the Home Secretary [gave] specific assurances that it [would] not be used to impose criminal liability retrospectively, and that no civil claims [would] be jeopardized thereby." 42 *Halsbury's Statutes of*

States, the separation of powers bars a federal court from giving operational weight to a pronouncement by Congress—or by an executive official vested by Congress with quasi-legislative rule-making authority— that what had theretofore been judicially declared as law "shall be deemed never to have had effect." I conclude, in short, that the Secretary's December 22 revision of Section 1903.4 cannot properly be given retrospective application to displace the contrary interpretation of Section 1903.4 which was laid down by the Supreme Court in *Barlow's* last May.

■ As the Secretary sees the matter, however, he is not really proposing to revise a Supreme Court adjudication—his quarrel is with Supreme Court dictum which, in his view, this lower Court has read too much into. In lowering his sights in this fashion, the Secretary has, very properly, reduced the level and intensity of his challenge to judicial action; but the character of the challenge has not undergone significant change. For there is unquestionably an adjudication—namely, the decision of this Court in November that "compulsory process," within the meaning of Section 1903.4 as it then stood, did not include *ex parte* inspection warrants—which the Secretary evidently thinks should retroactively yield place to the Secretary's *ex post* exegesis that "compulsory process," properly understood, "has been . . . intended to include" *ex parte* inspection warrants all along. But the separation of powers principles which preclude Congress, or the executive, from overruling the judgments of the Supreme Court have equal applicability for the judgments of the lowliest of Article III courts. A District Court is a small court. And yet there are those who love it.[12]

To say that the Secretary may not, consistently with the separation of powers, overrule a District Court judgment does not mean that he must acquiesce in it. He may appeal it—as he has not yet done in this case. He may point out the errors underlying it in asking other District Judges (and, indeed, this Judge in *Fleck*[13]) not to give it any precedential weight when the proper interpretation of Section 1903.4, as it stood prior to December 22, 1978, is presented in some other case. But even then he may not prevail in his insistence that his interpretation of Section 1903.4 is *binding* on courts. The pronouncements in *Budd* and like cases, giving "controlling weight" to whichever "reasonable interpretation" of its own regulation an agency selects, seem to have lost something of their authority—"in recent years legislative rulemaking has been subjected to a more intensive level of judicial review than the reasonableness standard would suggest." *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250 at 1258 (3rd Cir., 1978). And interpretative rules which purport to have retrospective application, ought to be able to win their way on their merits, with relatively little scope for the presumptions of validity that attend rules of prospective application. *Id.* at p. 1257. And so, treating the Secretary's reliance on revised Section 1903.4 as an invitation to me to reconsider my *Cerro* holding, I am unpersuaded that I should accept the Secretary's reading of the origi-

England [1972] 1404–05. The Home Secretary's undertaking appears to have been intended to allay concerns that the defendants in the case [*Hume's Case*] which triggered this burst of round-the-clock (Big Ben) legislative activity would be cast in jeopardy again by force of the retrospective statute.

12. Cf. the account in Lodge, *Daniel Webster* (Houghton-Mifflin, 1883) 89–90 of the argument for plaintiffs-in-error in *Dartmouth College v. Woodward*, 4 Wheat. 518, 4 L.Ed. 629 (1819).

13. Indeed, it may be that, in the context of the present *Cerro* motion, this Judge can be asked to reconsider the *Cerro* orders themselves, notwithstanding that many weeks have elapsed since November. See Local Rule 37(a). No reliance interest has accreted around the *Cerro* orders, so it is hard to see why they should be treated as, in some sense, "law of the case." Moreover, the Secretary chiefly bases his motion on an intervening event—the December 22, 1978 revision of Section 1903.4. In any event, in relation to *Fleck*—a wholly independent lawsuit—my *Cerro* rulings have the same claims to persuasive precedential authority as if decided by one of my colleagues on this Court, but no more. In short, what I decided in November is certainly open to reexamination.

nal Section 1903.4, either in *Cerro* or in *Fleck.*

▪ I have said that the Secretary cannot, by an interpretative rule of retrospective application, undo a prior judgment of a federal court. And I have also said that such a rule, if designed to show that a prior legal pronouncement of a court was in error and should be reconsidered, must carry with it a more persuasive bill of particulars than the new Section 1903.4 does. The new regulation essentially reaffirms the Secretary's already expressed unhappiness with the interpretation of the original Section 1903.4 which I articulated in November. But I have not found that it advanced the argument sufficiently so as to convince me to depart from my holding of last November. However, neither Congress nor an executive official vested by Congress with quasi-legislative authority is barred from altering a statute or rule so that a judicial interpretation regarded as ill-conceived will have no future application.[14]

Whether the December 22 revision of Section 1903.4 has the effect of changing the scope of the regulation *thereafter*—so as to permit the Secretary now to seek warrants *ex parte* as to plaintiffs in *Cerro* and in *Fleck*—depends on whether revised Section 1903.4 is an "interpretative rule," "general statement of policy," or "rule of agency organization, procedure or practice" within the meaning of Section 4 of the Administrative Procedure Act. 5 U.S.C. § 553(b).[15] If so, revised Section 1903.4 was exempt from the thirty days notice and opportunity for comment required for the generality of rules, and hence was validly adopted. To that question it is now appropriate to turn.

## IV.

Judge Van Dusen has observed that "Section 553 [Section 4 of the Administrative Procedure Act] was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 744 (3rd Cir. 1969). Addressing the particular categories of rule-making which Section 4 exempts from notice and opportunity for comment, Judge Hastie wrote in the same vein:

As the word interpretative suggests, and as the legislative history makes clear, interpretative rules consist of administrative construction of a statutory provision on a question of law reviewable in the courts . . . [as distinguished from] self-imposed controls over the manner and circumstances in which the agency will exercise its plenary power.

\* \* \* \* \* \*

Several courts have ruled that agency action cannot be a general statement of policy if it substantially affects the rights of persons subject to agency regulation . . . [The] outer boundary of the general policy exemption derives from congressional purpose in enacting Section 4—that the interested public should have an opportunity to participate, and the agency should be fully informed, before rules having such substantial impact are promulgated.

\* \* \* \* \* \*

In keeping with the type of action Congress sought to exempt, a matter "relating to practice or procedure" means technical regulation of the form of agency action and proceedings. This category too, should not be deemed to include any action which goes beyond formality and

---

14. Cf. *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 18 How. (59 U.S.) 421, 15 L.Ed. 435 (1856).

15. While the second sentence of Assistant Secretary Bingham's introductory comments characterizes the action taken as a "procedural rule," at a later point the Assistant Secretary seems to rely on all three excepted categories: "General notice of proposed rulemaking, public participation therein and delay in effective date are not required by 5 U.S.C. 553 since this section is an interpretive [*sic*] rule, general statement of policy and rule of agency procedure and practice." 43 FR at 59839.

substantially affects the rights of those over whom the agency exercises authority.

*Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112–14 (1974). See also, *Joseph v. United States*, 180 U.S.App.D.C. 281, 554 F.2d 1140 (1977); *Ranger v. Federal Communication Commission*, 111 U.S. App.D.C. 44, 294 F.2d 240 (1961); *Commonwealth of Pennsylvania v. United States*, 361 F.Supp. 208 (M.D.Pa.1973); *National Motor Freight Traffic Association v. United States*, 268 F.Supp. 90 (D.D.C.1967); *Phillips Petroleum Company v. Department of Energy*, 449 F.Supp. 760, 798–801 (D.Del. 1978); *Akron, Canton & Youngstown Railroad Company v. United States*, 370 F.Supp. 1231 (D.Md.1974); *Pharmaceutical Manufacturer's Association v. Finch*, 307 F.Supp. 858 (D.Del.1970).[16]

*Pickus*, dealing with the validity of various regulations of the federal Parole Board adopted without public notice, itself sheds some light on what sort of regulation "substantially affects . . . rights" of those regulated so as to require notice and comment procedures. Today, in reading *Pickus*, it seems almost incongruous that there could have been serious dispute about treating as "substantive" the Parole Board's guidelines on parole selection criteria—including, most particularly, the mode of calculating "an inmate's salient factor score." *Id.* 165 U.S.App.D.C. at 290, 507 F.2d at 1113. On those guidelines would turn decision as to early release or continued custody: in Judge Hastie's words, the guidelines "define a fairly tight framework to circumscribe the Board's statutorily broad power." On the other hand, it is hardly surprising that Judge Hastie viewed

as "clearly within the procedure and practice exemption" a rule (28 CFR § 2.15) which provided for regularly scheduled parole hearings at every federal correctional institution at which persons serving sentences longer than a year might appear in person. What is more significant is that Judge Hastie appears to have classified as "substantive" 28 CFR § 2.14, describing the reports to be considered by the Board in passing on parole applications, and 28 CFR § 2.16, providing that hearings on parole applications should "not be open to the public" and that the prisoner should not be represented "by counsel or by any other person." See 507 F.2d at ·1108 n.2, 1114.

In the hierarchy of entitlements, a considerably more appealing case can probably be made for permitting a prisoner's counsel to be present at a parole application hearing than for assuring a plant owner notice and an opportunity to be heard in opposition to the issuance of an OSHA warrant. In the first instance, it is hard to see what values, other than administrative expedition, are served by handicapping a prisoner in the presentation of his plea to be discharged from confinement. In the second instance, keeping the plant owner and counsel wholly in the dark about OSHA's application for compulsory process may seem to some to be a form of draconian bureaucracy, yet it can be defended as an important ingredient of the Secretary's tactical use of surprise in the deployment of his limited enforcement staff. See *Marshall v. Barlow's, Inc.*, 98 S.Ct. at 1822–24.[17]

But to say this is not to say that the owners of the millions of enterprises governed by OSHA have no significant stake in

16. The Secretary argues that the "substantially affects" test articulated in *Pickus* and other cases runs afoul of the Supreme Court's command in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) that federal reviewing courts not require federal administrative agencies to employ procedures beyond those set forth in the Administrative Procedure Act. But the determination of whether a regulation substantially affects the rights of those it regulates does not stray beyond the Act, rather it serves to define what is

a procedural rule within the meaning of the Act.

17. The December 22 revision of Section 1903.4 not only defines "compulsory process" to include an "*ex parte* application," it also vests in the Area Director and Regional Solicitor the authority, where 'circumstances exist which make preinspection process desirable or necessary," to apply for "[c]ompulsory process . . . in absence of an inspection or investigation . . . . ."

the question whether they may be heard in opposition to applications for inspection warrants. Nor is it to say that they cannot be expected to make any useful contributions to the Secretary's thinking about the question, if given notice and an opportunity to comment with respect to a proposed regulation which would make *ex parte* applications for warrants the norm.

What is at stake is the set of concerns which led the Supreme Court, in *Barlow's*, to instruct the Secretary that warrantless inspections are unconstitutional: "A warrant . . . would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by the statute, and is pursuant to an administrative plan containing specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and object of the search, beyond which limits the inspector is not expected to proceed." 98 S.Ct. at 1826 (footnotes omitted). The owner who is advised in advance of the pendency of the application for a warrant is enabled, through counsel, to assist the "neutral officer" in assuring that proper limits are not transgressed.[18] The argument in favor of relying on the "neutral officer" to draw proper lines unaided by the plant owner's counsel, with a view to preserving the Secretary's weapon of surprise, may well have greater weight in the Secretary's view. But it is hard to know why the Secretary can be so certain of the rightness of the revised Section 1903.4 as to insist as a matter of law on his entitlement to proclaim the new rule without notice, thereby remaining safely insulated from the opportunity to "educate [him]self," *Texaco, Inc. v. Federal Power Commission, supra*, in what those who are knowledgeable and interested—plant owners, workers, experts in safety and health—might have to say. For a high government official to insist on possessing and exercising a legal authority to adopt without notice a rule abolishing notice as an ingredient of the warrant process may be strong government. It doesn't seem very prudent government. And—

more important—it doesn't seem consonant with Section 4 of the Administrative Procedure Act.

This conclusion is reinforced by a review of the original promulgation, and subsequent amendment, of the group of OSHA regulations—"Part 1903—INSPECTIONS, CITATIONS AND PROPOSED PENALTIES"—of which Section 1903.4 is a part.

Part 1903 was publicly proposed by the Secretary on May 5, 1971. 36 FR 8376. On September 4, 1971, the Secretary announced, in the Federal Register, that "[a]fter consideration of the relevant material which has been submitted by interested persons, the proposal [was] adopted with some changes." *Id.* at 17850. Section 1903.4, as adopted, closely tracks, but is not word-for-word identical with, Section 1903.-11 as proposed. *Id.* at 17851; cf. *id.* at 8378.

On August 17, 1973, Assistant Secretary of Labor Stender signed, and on August 22 filed with the Federal Register, an amendment to Part 1903 which took effect when published in the Federal Register on August 23. That amendment redefined the terms "Area Director" and "Assistant Regional Director" in order to clarify certain sub-delegations of administrative authority. 38 FR 22623.

On July 24, 1974, Assistant Secretary of Labor Stender gave notice of intention to alter certain regulations relating to posters informing employees of rights under state law cognate to their OSHA-enforced rights. Section 1903.2, dealing with "Posting of Notice," was one of the regulations to be added to. 39 FR 26914. "After consideration of the relevant material which was submitted by interested persons, the proposal [was] adopted with some changes" effective November 5, 1974. *Id.* at 39035. The amendment to Section 1903.2 as adopted was very close to the amendment as proposed, except that the mandated minimum size of facsimiles of official posters was reduced from 10½ by 15¾ inches to 8½ by 14 inches, provided however that the cap-

---

**18.** The Court in *Barlow's* noted that "[d]elineating the scope of a search is particularly important where documents are involved." 98 S.Ct. at 1826 n.22.

tion should "be in large type, generally not less than 36 pt." *Id.* at 39036.

On February 5, 1975, Assistant Secretary Stender signed, and on February 10 he filed with the Federal Register, to take effect the following day, an amendment to Section 1903.14a entitled "Petitions for modification of abatement date." The purpose of the amendment was to delegate to Area Directors the authority previously exercised by the Occupational Safety and Health Review Commission to grant uncontested petitions for modification of abatement dates. Assistant Secretary Stender prefaced the amended regulation, which was designed to "facilitate the handling and expedite the processing of petitions for modification of abatement dates to which neither the Secretary nor any other interested party objects," with a recital that it was being adopted without conforming to the notice requirements of the Administrative Procedure Act because it fell within the statutory exemption for "rules of agency organization, procedure or practice." 40 FR 6334.

■ This telescoped history of Part 1903 of the OSHA regulations suggests that the Secretary has, in the past, been scrupulous to give notice, solicit comments, and indeed make changes, with respect to proposed regulations which seemed to impinge in some consequential way on the interests of those regulated and protected by the Act. In my view, the Secretary's failure to follow that congenial and respectful practice in relation to the December 22, 1978 amendment of Section 1903.4 was inconsistent with the strictures of Section 4 of the Administrative Procedure Act.

■ Since Section 1903.4 has not been validly amended, the Secretary, in my judg-ment, has no more power to seek an inspection warrant *ex parte* now than he had last November, when I held that, pursuant to my reading of· *Barlow's*, he had denied himself that authority under his own governing regulations.

## V.

It follows that the Secretary's motion to dissolve or modify the preliminary injunction in *Cerro* will be denied.

And for the reasons contained in my bench opinion on the *Cerro* temporary restraining order last November, I will grant a temporary restraining order in *Fleck*.[19]

A decision that the Secretary does not now have authority to seek inspection warrants *ex parte* is not a decision that it would be unwise for him to vest himself with such authority. As I have indicated above, there are good policy arguments to be made both for and against an *ex parte* warrant procedure in the OSHA context. The resolution of those competing policy arguments is up to the Secretary, after he informs himself fully; it is surely not up to me.

Last November, towards the close of my bench opinion, I observed that "what is required, if my view of the legal constraints that the Secretary is under is correct, is that the Secretary, if advised that his administrative responsibilities call for it, will wish to move to revise the applicable regulation. The Secretary already is armed with the extensive language of Mr. Justice White for a majority of the Court in *Marshall v. Barlow's, Inc.*, with assurance that a revised regulation setting out a procedure for *ex parte* warrants would be within the

---

**19.** The Secretary has cited three cases for the proposition that equitable relief is inappropriate—*In the Matter of Establishment of Blocksom and Company*, 582 F.2d 1122 (7th Cir. 1978); *Irey, Inc. v. Hodgson*, 354 F.Supp. 20 (N.D.W.Va.1972); *Lance Roofing Company, Inc. v. Hodgson*, 343 F.Supp. 685 (N.D.Ga.), aff'd. 409 U.S. 1070, 93 S.Ct. 679, 34 L.Ed.2d 659 (1972). In these cases the Secretary's agents had already effected a search and issued a citation, and administrative hearings were in progress at which the companies could "assert [their] defenses to the Secretary's citations or [their] generalized interest in the Act's nonenforcement." *Blocksom, supra* at 1124. In *Fleck*, as in *Barlow's* and *Cerro*, the right the plaintiff seeks to protect—the right to be protected from unauthorized searches—will be wholly lost unless injunctive relief is granted.

statute and *a fortiori* within the Constitution." My observation still holds.

## APPENDIX A

### Title 29—Labor

CHAPTER XVII—OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, DEPARTMENT OF LABOR

PART 1903—INSPECTIONS, CITATIONS AND PROPOSED PENALTIES

#### Objections to Inspection

AGENCY: Occupational Safety and Health Administration, Department of Labor.

ACTION: Procedural Rule.

SUMMARY: This amendment to 29 CFR 1903.4 clarifies the existing regulation respecting the legal action to be taken to permit inspection of a workplace over an employer's objection. Specifically, the revised regulation makes it clear that the term "compulsory process" as used in the regulation has been, and is, intended to include all legal action necessary to secure entry to the workplace, including *ex parte* application for an inspection warrant or its equivalent. The amendment also makes plain that compulsory process, as so defined, may be secured prior to an employer's objection to an inspection or investigation. The procedures for taking appropriate action to obtain entry have also been modified to promote administrative convenience.

EFFECTIVE DATE: December 22, 1978.

FOR FURTHER INFORMATION CONTACT:

Mr. James Foster, Office of Public Affairs, Occupational Safety and Health Administration, Third Street and Constitution Avenue N.W., Room N–3641, Washington, D.C. 20210 (Tel. No. 202–523–8151).

SUPPLEMENTARY INFORMATION: Section 8(a) of the Act provides:

In order to carry out the purposes of this Act, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized: (1) To enter without delay and at reasonable times any factory, plant, establishment, construction site, or another area, workplace or environment where work is performed by an employee of an employer; and (2) to inspect and investigate during regular working hours and at other reasonable times and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent or employee.

This provision was recently examined by the United States Supreme Court in *Marshall v. Barlow's, Inc.*, 98 S.Ct. 1816 (1978). In that case the Court held section 8(a) unconstitutional insofar as it purports to authorize warrantless nonconsensual inspections, but construed the Act to permit inspection pursuant to an employer's consent or a judicially authorized search warrant or its equivalent.

In so doing the Court noted that "the Act * * * regulates a myriad of safety details that may be amendable to speedy alteration or disguise" and recognized "[t]he risk * * * that during the interval between an inspector's initial request to search a plant and his procuring a warrant following the owner's refusal of permission, violations of this * * * type could be corrected and thus escape the inspector's notice." However, the Court did not view this risk as sufficient to justify inspection without a warrant, noting that "the advantages of surprise would [not] be lost, if after being refused entry, procedures were available for the Secretary to seek an *ex parte* warrant and to reappear at the premises without further notice to the establishment being inspected." Moreover the Court also noted that "[i]nsofar as the Secretary's statutory authority is concerned, a regulation expressly providing that the Secretary could proceed *ex parte* to seek a

warrant or its equivalent would appear to be as much within the Secretary's power as the regulation [29 CFR 1903.4] currently in force and calling for compulsory process." In originally promulgating this regulation, the agency had intended the phrase "compulsory process" to include any appropriate action necessary to compel entry to a workplace. Indeed, agency representatives routinely sought and received *ex parte* warrants as one of the means for securing entry to workplaces before the *Barlow's* decision. However, since a question has been raised as to the meaning of the regulation, and in order to remove any doubt on this important matter, the regulation is being amended to make explicit that the Secretary is authorized to obtain *ex parte* warrants or their equivalent.

The *Barlow's* Court also acknowledged that *ex parte* warrants issued *in advance* might become necessary in order to carry out the surprise inspections which the Court recognized are specifically contemplated by the Act. However, the Court's decision raises questions as to whether the Secretary's present regulation and the Field Operations Manual provide for the obtaining of compulsory process in advance of an employer's refusal. Thus, again to remove any doubt, the present regulation is amended to expressly state that the agency's authority to obtain inspection warrants is not dependent on an employer's prior refusal to permit an inspection. In other words, the agency may obtain warrants in advance of an inspection or investigation if such procedure is desirable or necessary under the circumstances. For example, a pre-refusal warrant for an inspection may be desirable in view of geographical factors or in situations where it is possible to predict that a refusal or other interference with the conduct of an inspection is likely.

Finally, the regulation is amended to authorize the Regional Administrator and the Regional Solicitor to institute procedures, as experience in obtaining warrants is gained, whereby compliance personnel may appear before magistrates or judges and seek warrants under the direction of the Regional Solicitor. Where instituted, such procedures will result in the conservation of Regional Solicitor resources and may also result in greater expedition in securing warrants. The regulation is also amended by deleting the requirement that the Area Director's consultation with the Regional Solicitor be "immediate" and that the Regional Solicitor's initiation of appropriate action be "prompt." This amendment is made in order to reflect that although it continues to be agency policy to minimize the delay between a refusal and the obtaining of compulsory process, discretion must be left to the Area Director and the Regional Solicitor to assign the appropriate priority to such cases.

This amendment is made pursuant to section 8(g)(2) of the Act (29 U.S.C. 657) and Secretary of Labor's Order No. 8–76 (41 FR 25059), in implementation of the general inspection and investigation authority conferred by section 8(a) of the Act. General notice of proposed rulemaking, public participation therein and delay in effective date are not required by 5 U.S.C. 553, since this section is an interpretive rule, general statement of policy and rule of agency procedure and practice.

In accordance with the above, 29 CFR 1903.4 is hereby revised to read as follows:

§ 1903.4   Objection to inspection.

(a) Upon a refusal to permit a Compliance Safety and Health Officer, in exercise of his official duties, to enter without delay and at reasonable times any place of employment or any place therein, to inspect, to review records, or to question any employer, owner, operator, agent, or employee, in accordance with § 1903.3, or to permit a representative of employees to accompany the Compliance Safety and Health Officer during the physical inspection of any workplace in accordance with § 1903.8, the Compliance Safety and Health Officer shall terminate the inspection or confine the inspection to

other areas, conditions, structures, machines, apparatus, devices, equipment, materials, records, or interviews concerning which no objection is raised. The Compliance Safety and Health Officer shall endeavor to ascertain the reason for such refusal, and shall immediately report the refusal and the reason therefor to the Area Director. The Area Director shall consult with the Regional Solicitor, who shall take appropriate action, including compulsory process, if necessary.

(b) Compulsory process may be sought in advance of an inspection or investigation if, in the judgment of the Area Director and the Regional Solicitor, circumstances exist which make preinspection process desirable or necessary.

(c) With the approval of the Regional Administrator and the Regional Solicitor, compulsory process may also be obtained by the Area Director or his designee.

(d) For purposes of this section, the term compulsory process shall mean the institution of any appropriate action, including *ex parte* application for an inspection warrant or its equivalent.

(Secs. 8(a), 8(g) Pub.L. 91–596, 84 Stat. 1600 (29 U.S.C. 657)).

Signed at Washington, D.C., this 15th day of December 1978.

Eula Bingham,
*Assistant Secretary of Labor.*

[FR Doc. 78–35664 Filed 12–21–78: 8:45 am]