**CERRO METAL PRODUCTS, Division of Marmon Group, Inc.**

v.

**MARSHALL, Ray, Secretary of Labor; Rhone, David H., Regional Administrator; Rieder, Matthew, Staff Attorney,**

**and**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local 1282, (Intervening Defts.)**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local 1282, Appellants in 79–1760**

**Ray Marshall, Secretary of Labor, United States Department of Labor, Appellant in 79–1761**

**FLECK INDUSTRIES, INC.**

v.

**MARSHALL, Ray, Secretary of Labor; Harris, Marshall, Regional Solicitor; Rhone, David H., Regional Administrator; Rieder, Matthew, Staff Attorney**

**and**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local 585,**

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local 585, Appellants in 79–1762

Ray Marshall, Secretary of Labor, United States Department of Labor, Appellant in 79–1763.

Nos. 79–1760 to 79–1763.

United States Court of Appeals, Third Circuit.

Argued Jan. 11, 1980.

Decided April 24, 1980.

Arlen Specter (argued), Mari M. Gursky, Bruce A. Cohen, Dechert, Price & Rhoads, Philadelphia, Pa., for appellees.

Richard Markowitz, Theodore Lieverman, Markowitz & Kirschner, Philadelphia, Pa., John A. Fillion, Gen. Counsel; Jordan Rossen, M. Jay Whitman, Leonard R. Page, Associate Gen. Counsel, Ralph O. Jones, Claude D. Montgomery (argued), Asst. Gen. Counsel, Detroit, Mich., for Intern. Union and its Locals 1282, 585.

Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol., for Occupational Safety and Health, Allen H. Feldman, Acting Counsel for App. Litigation, Charles I. Hadden (argued), U.S. Dept. of Labor, Washington, D. C., Marshall H. Harris, Regional Sol., Philadelphia, Pa., for the Secretary of Labor.

Before SEITZ, Chief Judge, and ADAMS and WEIS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal requires us to decide whether the Occupational Safety and Health Administration (OSHA) has properly authorized its compliance officers to seek *ex parte* inspection warrants in order to inspect industrial establishments for alleged health and safety violations. The problem is sharpened by the fact that Supreme Court dictum noting that such authority would be constitutional also stated that the relevant regulation did not provide for it. In preliminarily enjoining OSHA from obtaining warrants without providing plaintiff companies notice and an opportunity to be heard in opposition, the district court in effect concluded that, because OSHA had led the Supreme Court to interpret the regulation as excluding the warrants, the agency was "hoist with [its] own petar," [1] and that until the agency amended its regulation, it could not seek *ex parte* warrants. The district judge went on to hold that, to be binding, a change in the regulation required notice-and-comment rulemaking. We affirm.

## I.

The circumstances leading to the complaint in *Cerro* —the first of two cases consolidated in the district court—began when an employee was killed at the Bellefonte, Pennsylvania, manufacturing plant of Cerro Metal Products (Cerro). Upon notification by management of the accident OSHA conducted an inspection of the Bellefonte premises and issued a citation for safety violations shortly thereafter.

About a week later, OSHA received a signed complaint from the local union alleging numerous health and safety violations at Cerro's plant. Responding to the complaint, an OSHA compliance officer attempted an inspection, but Cerro denied him access to the worksite. An OSHA staff attorney then advised Cerro that he would apply for an *ex parte* inspection warrant on November 6, 1978, but on that very day Cerro initiated its own proceeding to enjoin OSHA from obtaining any inspection warrant without notice to the company and an opportunity for a hearing to oppose the warrant application. Cerro complained that (1) the extended inspection (three to four weeks) contemplated by the agency was part of an unjustified scheme of harassment, (2) the attempt to inspect by civil process was a subterfuge to obtain evidence of a crime, [2] and (3) OSHA had granted its officials no authority to apply for *ex parte* inspection warrants.

Ruling from the bench after a hearing on Cerro's motion, the trial judge granted a temporary restraining order. He expressed serious doubt that Cerro would prevail on its first and second theories, but the third contention—that OSHA lacked authority to apply for *ex parte* warrants—was thought to be correct. On November 27, a preliminary injunction based on the same reasoning was entered. The court's order enjoined OSHA "from applying for a search warrant or comparable process authorizing inspection of plaintiff's premises without

---

1. W. Shakespeare, Hamlet, act III, scene 4, line 208.

2. A criminal penalty is possible for a willful violation that causes death to an employee. 29 U.S.C. § 666(e) (1976).

giving plaintiff notice of the pendency of the application sufficient to afford plaintiff an adequate opportunity to be heard in opposition to the issuance of the process applied for."

OSHA did not appeal the order. Instead, it purported to amend the regulation held to be inadequate by the district court. The amendment explicitly interpreted the old regulation as providing for *ex parte* warrants.[3] Such revision was not thought by OSHA to require notice-and-comment rulemaking because, the agency asserted, it was "an interpretive rule, general statement of policy and rule of agency procedure and practice." 43 Fed.Reg. 59,838 (Dec. 21, 1978). In any event, the amendment served as the basis for the agency's motion to dissolve the preliminary injunction.

Shortly thereafter, Fleck Industries, Inc. (Fleck) entered the fray with a suit to enjoin OSHA from applying for an *ex parte* warrant to inspect its manufacturing plant in Willow Grove, Pennsylvania. After *Fleck* was consolidated with *Cerro*, the district court scheduled a joint hearing on OSHA's motion to dissolve the injunction that had been entered in the *Cerro* proceeding and on Fleck's prayer for an identical preliminary injunction.

OSHA's motion in *Cerro* was denied, and a temporary restraining order was granted Fleck, based on an extensive opinion filed

March 8, 1979. A preliminary injunction in *Fleck* soon followed. The United Automobile, Aerospace, and Agricultural Implement Workers of America and its local (hereafter, collectively, Union) moved to intervene as parties' defendant. The motion was granted on May 1, 1979, "subject to the proviso that the intervening defendants are not hereby authorized to require the redetermination of any matters adjudicated prior to the filing of their motion for leave to intervene [April 18, 1979]." OSHA appeals from both interlocutory orders, and the intervenor Union appeals from the order in *Fleck*.

## II.

The parties to this controversy have raised a variety of procedural and jurisdictional objections to our consideration of the merits on this appeal. It is to these issues that we first turn.

### A. Mootness

■ Cerro claims that the appeal in its case is moot because, after the district court order of March 8 declining to dissolve the preliminary injunction, OSHA obtained an inspection warrant by adversary process and has now inspected Cerro's premises.[4] This point was argued to the district court by the Union in a slightly different context[5] and was, we hold, correctly rejected.

---

3. The Secretary added, among other provisions not relevant to this case, a subsection (d) stating: "For purposes of this section, the term compulsory process shall mean the institution of any appropriate action, including *ex parte* application for an inspection warrant or its equivalent." 43 Fed.Reg. 59,838, 59,839 (Dec. 22, 1978) (29 C.F.R. § 1903.4(d) (1979)).

4. On March 14, 1979, the Secretary applied to a magistrate of the Middle District of Pennsylvania for a warrant to inspect Cerro's Bellefonte facility and requested a hearing on the matter. The magistrate set a hearing to be held on March 23, 1979. Shortly thereafter Cerro moved in the Eastern District of Pennsylvania to have the Secretary held in contempt since it viewed the application for a warrant as a violation of the preliminary injunction. On March 26, 1979, a hearing was held before the district judge in this case, who found that his order had not been violated and denied the contempt mo-

tion. That same day Cerro filed a notice of appeal from the magistrate's order setting a hearing. On the following day, a district judge for the Middle District denied that appeal. The hearing on the warrant application was then held before the magistrate on March 28, 1979, and March 31, 1979, and the warrant was issued on April 9, 1979. The next day Cerro filed a motion to quash the warrant: a hearing before the court for the Middle District was held on the motion on April 12, 1979, and execution of the warrant was stayed pending the disposition of the motion. On April 25, 1979, Cerro withdrew its motion to quash and the stay was terminated pursuant to a stipulation between the parties. The inspection finally began on May 8, 1979, and lasted until June 20, 1979.

5. The International Union and its local did not file a motion to intervene in *Fleck* until April 18, 1979, after the district court had filed its opinion dated March 8, 1979. In *Cerro*, how-

The Union had contended that the *Cerro* injunction jeopardized enforcement of the Act because OSHA would not be able to preserve the issue for appeal if it fulfilled its statutory obligation to protect the health and safety of workers by inspecting the plant pursuant to compulsory process other than *ex parte*. But the preliminary injunction is not limited to one inspection, and no party contends that one completed inspection removes the possibility of future attempts. The fact that OSHA has since been admitted to Cerro's property does not render the controversy moot, but only makes the circumstances surrounding it somewhat less exigent. *See* the district court's opinion, 467 F.Supp. 869, 873 n. 4 (W.D.Pa.1979).

B. *Standing of Intervenor to Appeal*

 ▉ We are said to lack appellate jurisdiction over the Union's appeal from the order in *Fleck* because "the union was granted only a limited status as an intervenor, which does not include standing with

regard to the issue being appealed." Brief for Appellees at 1. No authority is cited for this broad proposition, except the district court's proviso in granting leave to intervene that the Union was not "authorized to require the redetermination of any matters adjudicated prior to the filing of" the motion to intervene. We do not interpret this language as purporting to foreclose the Union's right to appeal the prior interlocutory order. An appeal is not retrograde, but is part of the statutorily authorized progress of a litigation.

Because we conclude that the order granting the Union full party status as an intervenor does not attempt to foreclose it from appealing the court's prior interlocutory order, we need not decide whether such a condition is proper when, as is apparently true here,[6] intervention of right under Fed. R.Civ.P. 24(a) is granted.[7] Consequently, we see no reason to depart from the general rule that an intervenor may appeal from any order adversely affecting the interest that served as a basis for intervention.[8]

ever, the International Union and a different local were granted leave to intervene as of January 18, 1979.

6. The order granting leave to intervene does not specify whether the intervention granted was permissive under Rule 24(b) or of right under Rule 24(a). The moving papers of the Union argued the motion on Rule 24(a) grounds, as did Fleck's memorandum in opposition.

7. The Advisory Committee's Note to the 1966 Amendment of Rule 24 stated that "[a]n intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." Professors Wright and Miller state that "[i]t had been supposed . . . that conditions could not be imposed on one who intervened of right and that he had all the privileges of an original party." 7A C. Wright & A. Miller, Federal Practice and Procedure § 1922, at 624 (1972). They criticize the Advisory Committee for attempting to qualify important textual language in an explanatory note. Conceding that several courts have accepted the Note's position and allowed conditions to be placed on intervention of right, *see, e. g. McDonald v. E. J. Lavino Co.*, 430 F.2d 1065, 1073 n. 7 (5th Cir. 1970); *Ionian Shipping Co. v. British Law Ins. Co.*, 426 F.2d 186, 191–92 (2d Cir. 1970), and that other scholars have advocated its

adoption, *see e. g.*, Kennedy, *Let's All Join In: Intervention under Federal Rule 24*, 57 Ky.L.J. 329, 375 (1969); Shapiro, *Some Thoughts on Intervention before Courts, Agencies, and Arbitrators*, 81 Harv.L.Rev. 721, 752–56 (1968). Wright and Miller acknowledge that the view that reasonable conditions of a housekeeping nature are permissible "is likely to prevail. It seems very doubtful, however, that the court has the right to make significant inroads on the standing of the intervenor of right. . . . " 7A C. Wright & A. Miller, *supra*, § 1922, at 626 (footnote omitted).

8. *See* F. James & G. Hazard, Civil Procedure § 10.19, at 512 n. 2 (2d ed. 1977) ("Because he will be so affected, [an intervenor] has standing to appeal from a judgment adverse to his interest even if neither of the original parties does so."); Shapiro, *supra* note 7, at 754 ("If there is a right to intervene, that right should carry with it the ability to appeal so long as there is an appealable interest."); *cf.* 7A C. Wright & A. Miller, *supra* note 7, at 632–33 (intervenor may appeal subsequent order only if it affects him and only to the extent of the interest making intervention possible); Intervention has been granted solely for the purpose of permitting an appeal of a district court order. *See Smuck v. Hobson*, 408 F.2d 175, 177–82 (D.C. Cir.1969) (en banc) (plurality opinion, but relevant holding joined in by all but McGowan, J.,

Furthermore, little if anything hinges on the point since OSHA also appealed in *Fleck.*

C. *Exhaustion of Administrative Remedies*

OSHA argues that we should not consider any of the issues raised in this appeal unless and until the employers exhaust their administrative remedies. Acceptance of that view would require the employers to allow inspection by *ex parte* warrants and would permit them to contest the issues raised here only if violations were found, citations were issued, and the companies decided to contest the citations before the Occupational Safety and Health Review Commission (Review Commission). Only after receiving the benefit of that tribunal's interpretation of the regulation, the argument proceeds, and only if the citation were not dismissed on other grounds, should we make our own assessment.

Principal support for the proposition advanced by OSHA is provided by *In re Restland Memorial Park,* 540 F.2d 626 (3d Cir. 1976), in which we stated that exhaustion was required even though OSHA's jurisdiction was challenged before an inspection had occurred. *Restland* came to this Court on an appeal from an adjudication of contempt and denial of the cemetery's motion to quash an inspection warrant. The employer challenged the warrant on the ground that its business was not in interstate commerce and therefore not within OSHA's statutory jurisdiction. We concluded that, at least in the posture of the *Restland* case, that issue was better left to determination in the first instance by the independent tribunal created by Congress to adjudicate OSHA disputes.

Except when required by statute,[9] exhaustion of administrative remedies is not an inexorable command, but is a matter of sound judicial discretion.[10] That discretion must be guided by the rationales advanced for the judicially created exhaustion doctrine.[11] The doctrine has been said to serve the following purposes: It (1) promotes administrative efficiency by "preventing premature interference with the agency processes," (2) respects executive autonomy by allowing an agency the "opportunity to correct its own errors," (3) facilitates judicial review by affording courts the benefit of the agency's experience and expertise,[12] and (4) serves judicial economy by having the agency or other tribunal rather than the district court, compile a factual record.[13] When a party presses a constitutional claim, exhaustion serves the additional purpose of furthering parsimony in judicial decisionmaking; an agency or tribunal decision favorable to the private party and based on the facts, regulations, or

see his separate opinion at 191); *Zuber v. Allen,* 387 F.2d 862, 863 (D.C.Cir.1967) (per curiam); *Pellegrino v. Nesbit,* 203 F.2d 463, 467 (9th Cir. 1953).

9. *See In re Restland Memorial Park,* 540 F.2d 626, 628 n. 9 (3d Cir. 1976); *United States ex rel. Sanders v. Arnold,* 535 F.2d 848, 852 nn. 5, 9 (3d Cir. 1976) (Adams, J., dissenting).

10. *NLRB v. Marine & Shipbuilding Workers,* 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968); *United States ex rel. Marrerro v. Warden, Lewisburg Penitentiary,* 483 F.2d 656, 659 (3d Cir. 1973), *rev'd on other grounds,* 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974); *United States ex rel. Sanders v. Arnold,* 535 F.2d at 852 (Adams, J., dissenting); *see United States ex rel. Brooks v. Clifford,* 412 F.2d 1137, 1138 n. 1 (4th Cir. 1969) (essence of exhaustion doctrine is flexibility).

11. *Cf. Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 246 (3d Cir. 1980) ("Determining whether the judge-made rule requiring exhaustion of administrative remedies should be relied upon in a given instance to delay or deny a remedy otherwise available from a court requires a careful analysis of the statutory scheme relied on by the plaintiff, of the completeness or incompleteness of remedies available from the agency, of the presence or absence of harm pendente lite, and of the likely intention of Congress with respect to private enforcement.")

12. *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); *In re Restland Memorial Park,* 540 F.2d at 628.

13. *Babcock & Wilcox Co. v. Marshall,* 610 F.2d 1128, 1137 (3d Cir. 1979); *see Weinberger v. Salfi,* 422 U.S. at 765, 95 S.Ct. at 2466.

statute prevents the creation of unnecessary constitutional precedent.[14] Finally, requiring exhaustion "also exemplifies deference within the constitutional framework to Congress's decision as to the proper forum for the initial resolution of disputes under its statutes." [15]

The first three reasons do not apply with equal force to OSHA cases, since it is not the agency itself, but an independent tribunal, that would, if exhaustion were required, pass on the issues raised. There are no agency processes regarding the interpretation of the regulation that can be interrupted; OSHA stands by its interpretation and no proceeding in the Review Commission may commence until a citation is issued and contested. The process to which the companies would submit specifically provides for the independent Review Commission, not OSHA, to correct the agency's errors. Finally, although it is important that the Review Commission obtain experience and expertise in adjudicating the validity of inspection warrants, see Babcock & Wilcox Co. v. Marshall, 610 F.2d 1128, 1140 (3d Cir. 1979), this factor should not be allowed to cut back on the equity jurisdiction of the courts to prevent irreparable harms before they occur, see id. at 1134 n. 13. Moreover, as discussed below, the issues presented are within the traditional expertise of the judiciary.

The fourth rationale is inapposite to this case because the issues here are purely legal and there is no factual dispute the resolution of which would dispose of the case.[16] Similarly, relegating the parties to the Review Commission would not serve the goal of avoiding unnecessary constitutional interpretation, because the issue to be decided, whether by an administrative tribunal or by an Article III court in the first instance, is the interpretation of an administrative regulation; no constitutional adjudication is at stake.

■ This leaves as the only basis for exhaustion, deference to the statutory schema. But the Act merely establishes the Review Commission as the exclusive tribunal for considering challenges to the validity of citations issued as a result of inspections. Adherence to that plan is appropriate when, as in Babcock & Wilcox Co. v. Marshall, 610 F.2d 1128 (3d Cir. 1979), and Marshall v. Whittaker Corp., Berwick Forge & Fabricating Co., 610 F.2d 1141 (3d Cir. 1979), the parties deliberately attempt to disrupt that process, after invoking it, by bringing a claim in the federal courts. Cerro and Fleck are not seeking to disrupt an ongoing Review Commission matter, but to prevent OSHA from initiating the process in an allegedly illegal manner. Moreover, since the issues must be resolved by interpreting an important decision of the Supreme Court as well as the Administrative Procedure Act—matters in which the federal courts and not the Review Commission have special expertise, see Dow Chemical Co. v. EPA, 605 F.2d 673, 680–81 (3d Cir. 1979)—we conclude that no legitimate purpose would be served by requiring exhaustion of administrative remedies in the context of this dispute.[17]

**14.** *Babcock & Wilcox Co. v. Marshall*, 610 F.2d at 1137.

**15.** *Id.*

**16.** In his unpublished opinion granting a temporary restraining order, the district judge noted that Cerro's contention as to the regulation "involves no factual claims controverted or otherwise. It is a purely legal submission." In *Restland*, by contrast, the decision as to whether the employer was in interstate commerce would require a record and findings of fact. In requiring exhaustion of administrative remedies for Fourth Amendment claims litigated after a completed inspection in *Bethlehem Steel Corp. v. Occupational Safety & Health Rev.*

*Comm'n.*, 607 F.2d 871 (3d Cir. 1979), this Court also emphasized the necessity of a factual record.

**17.** Alternatively, were this case thought to be one normally subject to the exhaustion of administrative remedies, we would hold that it comes within the long-established exception when "the prescribed administrative procedure is clearly shown to be inadequate to prevent irreparable injury." *American Fed'n of Gov't Employees, Local 1904 v. Resor*, 442 F.2d 993, 994–95 (3d Cir. 1971), *quoted in Barnes v. Chatterton*, 515 F.2d 916, 920 (3d Cir. 1975). An unauthorized inspection here would not constitute a constitutional injury, but an unau-

## C. Scope of Review

■ Because OSHA did not appeal from the grant of the preliminary injunction in *Cerro*, but only from the denial of its motion to modify or dissolve the injunction, the company asserts that OSHA may not now challenge the merits of the underlying injunction. This is, of course, the general rule,[18] but it is not one to be woodenly applied, especially when, as here, it would produce an anomalous result.

■ The question on the motion to dissolve the preliminary injunction was the effect to be given an amendment to the regulation; our resolution of that issue must depend—as did the district court's—on an assessment of what the regulation originally meant. When the issues are so inextricably intertwined, we are presented with the "special circumstances" previously noted by this Court in which the scope of appellate review of the denial of a motion to dissolve a preliminary injunction "reach[es] the underlying injunction." *Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc.*, 579 F.2d 786, 791 (3d Cir. 1978); *see Fern v. Thorp Public School*, 532 F.2d 1120, 1129 (7th Cir. 1976).[19]

## D. Standard of Review

"To support a preliminary injunction," we have declared, the moving party must show "irreparable injury" and "a reasonable probability of eventual success on the merits." Additionally, "the court must weigh the possibility of harm to the nonmoving party . . . and, when relevant, harm to the public." *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980). In reviewing the grant or denial of a preliminary injunction, our task is to determine "whether there has been an abuse of discretion, an error of law or a clear mistake in the consideration of the proof." *United States v. Commonwealth of Pennsylvania*, 533 F.2d 107 (3d Cir. 1976); *accord Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d at 357. Inasmuch as this case presents no factual dispute, we will now turn to the three legal issues forming the crux of this appeal: whether the preliminary injunction should be vacated because it harms the public by jeopardizing OSHA enforcement; whether an unauthorized inspection constitutes irreparable harm; and whether 29 C.F.R. § 1903.4, either as originally promulgated or as amended, empowers OSHA's compliance officers to apply for *ex parte* inspection warrants.

### III.

## A. Harm to the Public

■ When a preliminary injunction will interdict a governmental program or agency administration of it, potential harm to the public pendente lite must be considered, though it may not necessarily be determinative. *See Continental Group, Inc. v. Amoco*

thorized inspection is no less an irreparable injury because it violates a statute rather than the Fourth Amendment. *See* pp. 972–974 *infra*; district court opinion, 467 F.Supp. at 882 n. 19. The irreparable injury exception was never argued either to the district court or on appeal in *Restland.* Consequently, this Court had no occasion to consider that possibility in requiring exhaustion before an inspection occurred. *See* p. 974 n. 29 *infra.*

18. *See Merrell-Nat'l Laboratories, Inc. v. Zenith Laboratories, Inc.*, 579 F.2d 786, 791 (3d Cir. 1978) ("We do not believe . . . that in the general case a defendant should be allowed to use the appealability of an order denying modification of an injunction to circumvent the time bar to appeal from the underlying preliminary injunction. The purpose of the motion to modify an injunction is to demonstrate that changed circumstances make the continuation of the order inequitable."); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3924, at 88–89 (1977) ("Ordinarily, review should not include the propriety of the original order, but should be confined to the propriety of refusing to vacate or modify it.")

19. For the same reason, we reject Fleck's contention that OSHA is precluded from re-litigating in *Fleck* the issue decided against it in *Cerro.* We therefore need not reach and express no view on the question whether a decision to grant a preliminary injunction is sufficiently final to be subject to principles of res judicata. *See generally* Restatement (2d) of Judgments § 41 & Comments (Tent. Draft No. 1, 1973).

*Chemicals Corp.*, 614 F.2d at 357–58. Specifically, in *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 924 (3d Cir. 1974), one of the relevant factors in reversing the grant of a preliminary injunction was the Federal Maritime Commission's statement in a brief amicus curiae that the interlocutory order encroached on its statutory responsibility to regulate maritime practices and policies.

■ Drawing an analogy, OSHA contends that the injunctions in this case interfere with its enforcement of the Act and its mandate to assure safe and healthful working conditions to the nation's workers. *See* 29 U.S.C. § 651(b) (1976). The injunctions are asserted to be "plainly antithetical to the interests of swift, surprise inspections represented by [the] statutory scheme." Brief for the Secretary of Labor at 31.

That requiring adversary rather than *ex parte* process to compel an inspection is more burdensome to the agency may be conceded. But there is no evidence that such a requirement, particularly as applied to these two companies, would seriously hamper the agency's enforcement responsibility. By the agency's own count, employers resist inspections and demand judicial process in only a small percentage of cases.[20] For an indeterminate but lengthy period before *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), OSHA pursued a policy of having its officers seek adversary process rather than

ex parte warrants after being refused entry. In *Barlow's*, the Supreme Court interpreted that policy as being required by the regulation and stated: "If this safeguard [of providing notice to the employer in seeking compulsory process] endangers the efficient administration of OSHA, the Secretary should never have adopted it, particularly when the Act does not require it." 436 U.S. at 319, 98 S.Ct. at 1823–1824.

A requirement of adversary process for nonconsensual administrative inspections would not be unreasonable. Indeed, it has been advocated by the American Law Institute and by an eminent scholar of Fourth Amendment law.[21] If OSHA disagrees and believes that its prior practice of seeking court orders rather than *ex parte* warrants endangers the public by rendering its enforcement of the Act ineffective, it need only go through the minimal delay and inconvenience of amending 29 C.F.R. § 1903.4 by providing advance notice and allowing thirty days for comments. *See* 5 U.S.C. § 553(b), (d) (1976).

## B. *Irreparable Injury to the Employers*

■ To support a preliminary injunction, the moving party must show harm that is both imminent and irreparable.[22] OSHA does not challenge the district court's finding of imminency, which, in fact, was based on representations made by agency officials.[23] It does contend, however, that any

---

**20.** In a report to the National Safety Congress, the chief of the OSHA division of field coordination stated that in the four months following *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), inspection warrants were demanded in fewer than 500 of the approximately 11,000 inspections attempted. "The vast majority of employers are voluntarily allowing us to make the inspections," he said. [1978] 8 Occup. Safety & Health Rep. (BNA) 564. At the district court's hearing on the motion to dissolve the injunction in *Cerro*, OSHA's attorney represented that, in the six months after *Barlow's*, the agency had encountered 1,200 refusals of entry out of 93,000 inspections.

**21.** *See* ALI, A Model Code of Pre-Arraignment Procedure § SS 250.3(3), at 155, 542 (1975); 3 W. LaFave, Search and Seizure § 10.1, at 198 (1978).

**22.** *See, e. g., Continental Group v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980); Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv.L.Rev. 525, 541 (1978).

**23.** In the unreported opinion granting the injunction in *Cerro*, the trial judge stated:

In addition to the Secretary, those of his subordinates who have discretion on his behalf to seek or refrain from seeking a search warrant are the defendants in this proceeding and they insist that they have authority to seek such a warrant without notice to plaintiff and they forthrightly acknowledge their intention to exercise that claimed authority by ex parte recourse to a magistrate in the Middle District if not judicially restrained.

harm to the companies that might come from the allegedly unauthorized inspections is fully reparable by administrative remedies.

The argument is, of course, similar to that advanced for requiring exhaustion of administrative remedies: The companies should allow the inspection and seek to undo any harm—*i. e.*, citations for safety and health violations—in the statutorily established Review Commission. This line of reasoning has two premises, neither of which would appear to be accurate: (1) that the only legally cognizable harm from an inspection is the legal sanction resulting from any evidence found; and (2) that it is clear in the present state of the law that any evidence obtained in an unauthorized inspection may not be used against an employer.

OSHA acknowledges, as it must,[24] that an inspection violating the Fourth Amendment would constitute irreparable injury for which injunctive relief would be appropriate. *See* Brief for the Secretary of Labor at 17 n.16. But it attempts to distinguish between injury to rights with a statutory base and those anchored in the Constitution. This difference may have significance in some legal contexts,[25] but does not answer the question in reviewing a preliminary injunction whether irreparable injury was established. The question is whether there is cognizable injury, not what type of law provides protection from it.

If, as the Supreme Court has held, a company has a privacy interest in its place of employment,[26] then an unauthorized government invasion of that place—whether that invasion violates a statute or the Constitution—is an injury. Moreover, a typical OSHA inspection is more than an unobtrusive scrutiny. Inspections of entire plants—referred to as "wall to wall" in agency jargon—frequently extend over several weeks.[27] They necessarily create inconvenience to the employer and a certain amount of lost time for employees who escort the inspector or are otherwise disrupted in their work. Even if no violations were found and no citations issued, an employer would not regard such an inspection as benign.[28]

As to OSHA's point that any harm from an unauthorized inspection may be remedied by invalidating the resulting citations in a Review Commission proceeding, we have noted in a recent case that the question whether an exclusionary rule applies to Review Commission cases—even for Fourth Amendment violations—is an unsettled and highly controversial area of the law yet to be definitively addressed by a court of appeals. *See Babcock & Wilcox Co. v. Marshall*, 610 F.2d 1128, 1139 & n.41 (3d Cir. 1979). OSHA's position in this case can only charitably be described as paradoxical, since it argued quite adamantly in *Babcock & Wilcox* that illegally obtained evidence should not be suppressed in an OSHA enforcement proceeding.[29] Because

---

24. *See, e. g., United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974) (search made without probable cause fully accomplishes Fourth Amendment injury).

25. One difference may in fact cut against OSHA's argument. Constitutional injuries may be the subject of restitution in a separate action. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). When statutes are at issue, though, it must first be ascertained that a private right of action against the challenged government conduct was intended. *See, e. g., Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

26. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978).

27. Indeed, the inspection of *Cerro* that eventually occurred pursuant to adversary process lasted over six weeks. Brief for Appellees at 41 n.7.

28. *See Marshall v. Huffhines Steel Co.*, 478 F.Supp. 986 (N.D.Tex., 1979) (in contempt proceeding to enforce *ex parte* warrant) (Review Commission proceedings to contest citations "provide no relief against the inspection itself").

29. *See* Brief for the Secretary of Labor at 46–54, *Babcock & Wilcox Co. v. Marshall*, 610 F.2d 1128 (3d Cir. 1979). In *Babcock & Wilcox*, the company had moved in the district court to quash an already executed inspection warrant. Because the inspection had already occurred, the applicability or not of the exclusionary rule

it is quite unclear in the present state of the law whether a company could have citations quashed on the ground that they had been issued as a result of an unauthorized inspection, the district court did not err in finding an imminent threat of irreparable harm to the companies in this case.

We pass, then, to the important task of interpreting the regulation that engendered this dispute.

## IV.

Because OSHA contends that its December 1978 amendment explicitly interpreting "compulsory process" to include *ex parte* warrants represents a long-standing and consistent interpretation entitled to great deference, we must begin our analysis by examining the regulation's short yet checkered history.

### A. *The Use and Abuse of 29 C.F.R. § 1903.4*

Soon after the effective date of the Occupational Safety and Health Act, the Secretary of Labor published a notice of proposed rulemaking for a regulation to provide procedures and policies for "inspections, citations, and proposed assessment of penalties." 36 Fed.Reg. 8,376 (May 5, 1971). Proposed § 1903.11 consisted of the Secretary's instructions to his subordinates upon an employer's objection to an inspection. The Compliance Officer was to report the refusal and the reasons therefor to the Area Director. That Director was to consult with the Regional Administrator and the Regional Solicitor, "who shall promptly seek appropriate compulsory process." *Id.* at

8,378. The regulation was subsequently renumbered § 1903.4 and was adopted with a minor change directing the specified regional officers to "take appropriate action, including compulsory process, if necessary." *Id.* at 17,851 (Sept. 4, 1971) (current version at 29 C.F.R. § 1903.4 (1979)). Soon after, the agency issued its "manual of guidelines for implementing the [Act]," which, in addition to language identical to that of the regulation, provided that the Area Director was to "request that an inspection warrant be obtained." V Dep't of Labor, OSHA, Compliance Operations Manual, at V–6 (Jan. 1972).[30]

That the envisioned procedure for obtaining a warrant was *ex parte* is indicated by OSHA's instruction to its Compliance Officers that "[e]xcept in unusual circumstances which are cleared with the Regional Solicitor's office, there shall be no advance warning to the employer of the fact either that a warrant has been secured or that inspection will take place pursuant to the warrant." *Id.* at V–8. This language was repeated verbatim in the 1974 manual, *see* V Dep't of Labor, OSHA, Field Operations Manual, at V–5 (July 1, 1974), but was changed in the 1976 edition to read that "there shall be no advance notice to the employer concerning compulsory process or pending inspection." V Dep't of Labor, OSHA, Field Operations Manual Change 2, at V–5 (Jan. 1976). Thus it now remains. *See id.* Change 9 (Aug. 1978). No explanation has been advanced for the change from the more specific "inspection warrant" to the general term "compulsory process." Nevertheless, OSHA contends that these instructions forbidding advance notice consti-

---

was not relevant to the issue of the exhaustion of administrative remedies. The harm caused by the inspection itself could not be undone, and the company could as well present its exclusionary rule argument to the Review Commission in the first instance as to the district court. *See id.* at 1139.

The issue of irreparable harm was never raised in *Restland,* where we required exhaustion of administrative remedies even though an inspection had not yet occurred. 542 F.2d at 627. Because the case arose from a motion in the district court to quash the warrant, and not from a complaint for equitable relief, no explic-

it finding of irreparable injury was required. The employer in *Restland* made no attempt, either in the district court or on appeal, to argue an exception to the exhaustion requirement based on such harm. The short brief filed by the company in that case did not deal with the issue at all, and no reply brief was filed in response to OSHA's argument that exhaustion was required.

30. The pages quoted from are dated Nov. 15, 1971, but the cover date of the Manual is January 1972.

tute a consistent, longstanding interpretation of the regulation by the Secretary.[31]

The contrary argument is derived from representations made to the Supreme Court by the Government in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). In attempting to persuade the Court that a warrant for OSHA inspections should not be required, the Government seemed to posit the extreme alternatives of entry without a warrant or entry only pursuant to adversary process.

The *Barlow's* case arose when an employer refused to allow a routine OSHA inspection. The agency then went to the district court with an application for an order compelling entry and inspection. An order to show cause was issued by the district court, and, after an adversary hearing, the order compelling an inspection was issued. *Barlow's, Inc. v. Usery*, 424 F.Supp. 437, 439 (D.Idaho 1976), *aff'd*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). In presenting the Secretary's argument before the Supreme Court, the Solicitor General suggested that this manner of seeking compulsory process by adversary hearings was typical. In the Statement of Jurisdiction, the Government argued against the "significant delay" that would occur "where—as is com-

monly the case in civil warrant practice—a show cause order issues before compulsory process may be obtained." Statement of Jurisdiction at 11, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

A footnote in that brief reinforces the view that an interpretation of the regulation as providing for adversary process was part of the Government's litigation strategy: [32]

> Agency regulations currently require the secretary to obtain a court order authorizing entry if the inspector is initially refused entry. See 29 C.F.R. § 1903.4. A ruling by this Court that no warrant is required should greatly reduce an employer's incentive to refuse entry. Moreover, since the district courts are always open for compulsory process purposes, . . . and there would ordinarily be no cognizable contention in opposition, orders authorizing entry would issue swiftly and routinely in the event of refusals, further reducing the interim available to employers.

*Id.* at n.13. At oral argument as well, the Government took great pains to characterize the regulation as providing for adversary process.[33]

---

**31.** The present cases might not have arisen in the same procedural context if counsel for OSHA had not informed the employers of the intention to seek *ex parte* warrants. *See* p. 967, *supra*. No explanation for the advance notice given in these cases has been suggested.

**32.** That this was a conscious litigation strategy rather than inadvertence is confirmed by one expert on OSHA law. Noting "[t]he Secretary's policy of attempting to secure an injunction ordering the employer to submit to an inspection, rather than seeking an administrative warrant." Professor Rothstein states that "[t]his policy was consistent with the Secretary's pre-*Barlow's* position that the Act authorized warrantless inspections. Therefore, a refusal to permit an inspection was met with compulsory process in the form of an injunction and not the 'unnecessary' warrant." Rothstein, *OSHA Inspections After Marshall v. Barlow's, Inc.*, 1979 Duke L.J. 63, 86 & n.143. Moreover, OSHA explains in its brief:

> The Secretary's practice with respect to providing employers notice that he was seeking compulsory process was not uniform. Proc-

ess was at first obtained in the form of *ex parte* warrants, . . . but the Secretary subsequently began to seek orders compelling entry with notice when confronted with a refusal. Rightly or wrongly, this change constituted a tactical decision in order to protect the Secretary's pre-*Barlow's* legal position that nonconsensual inspections without a warrant were constitutional. The Secretary's policy was to seek orders compelling entry based on the inspection authority granted by section 8(a) [29 U.S.C. § 657(a) (1976)], but without attempting to show any probable cause. Since this policy of seeking orders to protect the Secretary's legal position was a "special circumstance" approved by the Office of the Solicitor, it was consistent with the manual's exception to the prohibition against advance notice of obtaining a warrant.

Brief for the Secretary of Labor at 24 n.24.

**33.** The following two colloquies with the Court are illustrative:

> QUESTION: And what does the regulation say about it?

The result of this litigation strategy was that Mr. Justice White's opinion for the Court devoted a lengthy section, almost half of the opinion, to answering the Government's argument that if warrantless searches were held to be unconstitutional, enforcement of the Act would by stymied by the delay required to pursue adversary process.[34] The Court reasoned that the quandary posed by the Government—between warrantless searches and searches pursuant to adversary process—was one of OSHA's own making since its regulation required more than was necessary under the Act or the Constitution. Of the much-discussed 29 C.F.R. § 1903.4, the Supreme Court said:

> The regulation represents a choice to proceed by process where entry is refused; and on the basis of evidence available from present practice, the Act's effectiveness has not been crippled by providing

those owners who wish to refuse an initial requested entry with a time lapse while the inspector obtains the necessary process. Indeed, the kind of process sought in this case and apparently anticipated by the regulation provides notice to the business operator. If this safeguard endangers the efficient administration of OSHA, the Secretary should never have adopted it, particularly when the Act does not require it. Nor is it immediately apparent why the advantages of surprise would be lost if, after being refused entry, procedures were available for the Secretary to seek an *ex parte* warrant and to reappear at the premises without further notice to the establishment being inspected.

436 U.S. at 317–20, 98 S.Ct. at 1823–1824 (footnotes omitted). A more explicit interpretation of the regulation is an accompanying footnote stating that "a regulation

---

MR. McCREE (Solicitor General): Well, the Secretary has adopted a regulation that provides, in summary, that the Area and Assistant Regional Director and the Regional Solicitor shall promptly take appropriate action, including compulsory process, if necessary. Now, as a matter of practice, the Regional Inspectors have then gone to the court to obtain an order requiring the proprietor to submit to the inspection. And, indeed, that was done here. On the 30th of December, the District Court to which the application was made, after issuing an order to show cause to which Barlow's responded with counsel, issued an order requiring entry for the purpose of inspection.

QUESTION: What does the United States—What does the inspector submit to the court to get such an order? Does he just make the presentation such as you did, that there is a reasonable inspection scheme and the statute permits it and we want to get in?

MR. McCREE: That is essentially the representation he makes to the court. And the court in this case issued an order to show cause which permitted the employer to appear and assert any objection he might have.

QUESTION: So that it is more than the equivalent of a search warrant if you could have gotten a search warrant for this reason?

MR. McCREE: Considerably more, because it is an adversary proceeding and the search warrant, of course, is *ex parte.*

Transcript of oral argument at 7–8. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), *quoted in* district court opinion, 467 F.Supp. at 875 n.9.

QUESTION: Mr. Solicitor General, it seems to me that the Secretary here by his regulations has indicated that "We will just give him notice," and he has instructed his inspectors, "if refused entry; don't break in and take advantage of an unannounced entry. Go to court."

MR. McCREE: If the Court please, he first instructs his inspector to seek entry, without notice—

QUESTION: I know, but then he permits him to be turned away and tells him if he is turned away to go to court.

MR. McCREE: If the Court please, there are regulations which forbid giving advance notice of the intent to inspect, and there are even penalties on the employees for disclosing the intention of inspecting. So it's really not its purpose. The regulation, as the court appropriately points out, does afford notice once the court is asked to issue such an order. That is the rare case. That is the case where he has been turned down and we hope this Court's ruling today will make it unnecessary to do it.

*Id.* at 41, *quoted* in district court opinion, 467 F.Supp. at 875 n.9.

34. We thus do not agree with the characterization by the District Court of Maine regarding the Supreme Court's treatment of § 1903.4 in *Barlow's* as a "passing observation." *In re Worksite Inspection of S. D. Warren, Division of Scott Paper*, 481 F.Supp. 491, 494 (D.Me. 1979).

expressly providing that the Secretary could proceed *ex parte* to seek a warrant or its equivalent would appear to be as much within the Secretary's power as the regulation currently in force and calling for 'compulsory process.' " [35]

In stating this, the Court was well aware of the very argument OSHA advances before us, and adopted by the dissent, concerning the understanding of the regulation reflected in OSHA's manual to its field officers. Indeed, the evolution of the language in the manual through its various editions is summarized in a footnote of Justice White's opinion. 436 U.S. at 318 n.13, 98 S.Ct. at 1823.

### B. *The Effect of Dictum*

OSHA argues that the Supreme Court's interpretation of § 1903.4 is erroneous dictum that we need not follow and that should not vitiate the deference normally to be accorded an agency's interpretation of its own regulation. In amending the regulation the Secretary explained, in explicit reference to the *Barlow's* decision and oblique reference to the district court's preliminary injunction in *Cerro* : [36]

> In originally promulgating this regulation, the agency had intended the phrase "compulsory process" to include any appropriate action necessary to compel entry to a workplace. Indeed, agency rep-

resentatives routinely sought and received ex *parte* warrants as one of the means for securing entry to workplaces before the *Barlow's* decision. However, since a question has been raised as to the meaning of the regulation, and in order to remove any doubt on this important matter, the regulation is being amended to make explicit that the Secretary is authorized to obtain *ex parte* warrants or their equivalent.

43 Fed.Reg. 59,839 (Dec. 22, 1978).

The Supreme Court's interpretation of § 1903.4 may well be technically categorized as dictum, since it did not decide the precise issue before the court,[37] but it was not the sort of passing reference or overly generalized statement that causes courts to assign little, if any, weight to dictum.[38] The Government's litigation strategy ensured that the Court's attention would be focused on the regulation. The meaning of the regulation need not have affected the case, and might not have been examined at all, had the Government not seized on its now-discarded interpretation in an attempt to convince the Court of the unreasonableness of requiring warrants. The Supreme Court's interpretation of the regulation was therefore characterized by the trial judge as "dictum integral to the constitutional holding announced by . . . the Court." 467 F.Supp. at 876.[39]

---

**35.** 436 U.S. at 318 n.15, 98 S.Ct. at 1824 n.15. *But see In re Worksite Inspection of S. D. Warren, Division of Scott Paper*, 481 F.Supp. at 494 ("[T]he Court did not definitively state that the regulation anticipated notice to the employer, but only that the regulation 'apparently' did so.")

**36.** In a hearing before the district court, counsel for OSHA acknowledged that the preliminary injunction issued in *Cerro* was "a damn strong impetus" to the amendment.

**37.** 467 F.Supp. at 876. The issue presented and decided in *Barlow's* was whether the Fourth Amendment requires a warrant for a nonconsensual OSHA inspection. *See* 436 U.S. at 310, 98 S.Ct. at 1819.

**38.** As Chief Justice Marshall explained:
It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which

those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the point is presented for decision. The reason of this maxim is obvious.
The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.
*Cohens v. Virginia*, 19 U.S. 120, 179, 6 Wheat. 264, 398, 5 L.Ed. 257 (1821).

**39.** A similar distinction has been drawn between "judicial dictum" and "obiter dictum" :
Judicial dicta are conclusions that have been briefed, argued, and given full consideration even though admittedly unnecessary to decision. A judicial dictum may have great

■ Accordingly, although perhaps not bound by the meaning ascribed to § 1903.4 in *Barlow's*, we choose to follow it as a matter of sound judicial policy. Therefore, we hold that the district court did not err in concluding that as of the time of the *Cerro* preliminary injunction, § 1903.4 did not empower OSHA to seek *ex parte* warrants.

## C. The 1978 Amendment

OSHA's argument as to the effect its 1978 amendment of the regulation should have on our judgment may be divided into two distinct, though related, points: (1) The amendment is an authoritative and definitive interpretation by the agency of its own regulation, to which a court is required to give "controlling weight." (2) Amendment of the regulation without prior notice and the opportunity to comment was proper, and the district court therefore erred in declining to dissolve its preliminary injunction after the amendment. It is to these two points that we now turn.

### 1. Weightiness

■ In *Budd Co. v. Occupational Safety & Health Rev. Comm'n*, 513 F.2d 201 (3d Cir. 1975) (per curiam), this Court stated that "the agency's interpretation of a regulation 'is deemed of controlling weight as

long as it is one of several reasonable interpretations . . .'." *Id.* at 205. That statement, however, must be understood in the context of the reasoning preceding it and upon which it was based. That reasoning was the principle set forth by the Supreme Court in *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), that great deference is due to the " 'contemporaneous construction of a statute' " by the agency charged with its enforcement. And " '[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.' " *Budd Co.*, 513 F.2d at 205 (quoting *Udall v. Tallman*, 380 U.S. at 16, 85 S.Ct. at 801).

OSHA's 1978 amendment and accompanying official explanation to the regulation promulgated in 1971 do not constitute a "contemporaneous construction." It is better analogized to subsequent congressional pronouncements that are not properly considered as legislative history in interpreting a statute.[40] OSHA's argument that we should nevertheless defer to the interpretative amendment because it echoes the interpretation of the agency's first Compliance Operations Manual would have more force if the manual had remained consistent through the years. The *Barlow's* Court thought that it had not.[41] Our analysis of

weight. A Wisconsin court has stated it thus: "When a court of last resort intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court which it will thereafter recognize as a binding decision."
Comment, *Dictum Revisited*, 4 Stan.L.Rev. 509, 513 (1952) (quoting *Chase v. American Cartage Co.*, 176 Wis. 235, 238, 186 N.W. 598, 599 (1922)). *See generally* R. Cross, Precedent in English Law 35–101 (2d ed. 1968).

40. *See United Air Lines, Inc. v. McMann*, 434 U.S. 192, 200 n.7, 98 S.Ct. 444, 449 n.7, 54 L.Ed.2d 402 (1977) ("Legislative observations 10 years after passage of the Act are in no sense part of the legislative history."); *Haynes v. United States*, 390 U.S. 85, 87 n.4, 88 S.Ct. 722, 725 fn.4, 19 L.Ed.2d 923 (1968) (views of a subsequent Congress "provide no controlling basis from which to infer the purposes of an earlier Congress"); *Sikora v. American Can Co.*, 622 F.2d 1116, 1121 (3d Cir. 1980).

41. *See* 436 U.S. at 318 n.13, 98 S.Ct. at 1823. A pre-*Barlow's* three-judge district court also believed that language changes in the Manual reflected a shift in OSHA practice and interpretation of the regulation. In distinguishing a contrary case, the district court stated:
No search warrant was sought by the Secretary in [*Brennan v. Gibson's Products, Inc.*, 407 F.Supp. 154 (E.D.Tex.1976), *vacated*, 584 F.2d 668 (5th Cir. 1978)] although the Administration's *Compliance Operations Manual* advised that an inspection warrant be pursued upon an employer's attempt to limit or interfere with an OSHA inspection. 407 F.Supp. at 156 & n.4. However, it was apparent from the stipulated facts in *Gibson's Products*, as it is in this case, that no probable cause was shown which would justify issuance of a warrant. *Id.* at 156.
It should be noted that, at present, the Administration does not recommend pursuit of a warrant where an employer refuses to allow his premises to be inspected. Rather, where such refusal to permit inspection is

the history of OSHA's opportunistic interpretation of the regulation also indicates that the amendment does not satisfy the standard for deference enunciated in the more recent cases: that the interpretation be a "consistent and longstanding" one.[42]

Particularly instructive is the Supreme Court's discussion in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), regarding the deference to be accorded an agency's interpretative rulings. The Court reaffirmed the statement of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944):

We consider the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and in-

formed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.[43]

The interpretative ruling in *General Electric* was said not to "fare well" under the *Skidmore* guidelines because, having been promulgated eight years after the statute, it was not a contemporaneous interpretation, and because it was inconsistent with the agency's previously enunciated position.[44]

We therefore decline to give "controlling weight" to OSHA's interpretation of its

encountered, resort to "legal process" or "compulsory process" is advised. *See* OSHA Field Operations Manual P.P. V–6—V–7 (Sept., 1975); 29 C.F.R. § 1903.4. *Dunlop v. Hertzler Enterprises, Inc.*, 418 F.Supp. 627, 630 n.6 (D.N.M.1976).

**42.** *United States v. National Ass'n of Securities Dealers, Inc.*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975); *accord International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 & n.20, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979); *Dow Chemical Co. v. EPA*, 605 F.2d 673, 680–81 (3d Cir. 1979); *see Daughters of Miriam Center for Aged v. Mathews*, 590 F.2d 1250, 1258 (3d Cir. 1978) (noting increased level of judicial scrutiny of administrative rulemaking in recent years).

A legal realist view is provided by Professor Davis:

Unquestionably one of the most important factors in each decision on what weight to give an interpretative rule is the degree of judicial agreement or disagreement with the rule. When a court agrees with it, the court is likely to utter words that it is controlling, that it has great weight, or that it must be given effect unless it is unreasonable or inconsistent with the statute. When the court disagrees, that is, when the rule seems to the court to be inconsistent with the statute or calls for a result the court would not reach, the court may take the position that the interpretative rule is entitled to no weight. Even if the court finds that the policy embodied in the rule is neither required nor prohibited by the statute, the court is free to reject the rule if it prefers a different result.

A court which disagrees with an interpretative rule substitutes its judgment. A court

which agrees either follows the rule, reciting the need for deference, or substitutes judgment, thereby turning the rule into judge-made law. A court which is in doubt gives weight to the rule but is not bound by it. 2 K. Davis, Administrative Law Treatise § 7:13, at 60–61 (2d ed. 1979).

**43.** *Quoted in General Electric Co. v. Gilbert*, 429 U.S. at 141–42, 97 S.Ct. at 410–411; *See SEC v. Sloan*, 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); *Adams Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 574 n.5, 54 L.Ed.2d 538 (1978).

**44.** 429 U.S. at 142, 97 S.Ct. at 411. *See Batterson v. Francis*, 432 U.S. 416, 425 n.9, 97 S.Ct. 2399, 2405, n.9, 53 L.Ed.2d 448 (1977) ("Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise."); *cf. NLRB v. Boeing Co.*, 412 U.S. 67, 74–75, 93 S.Ct. 1952, 1956–1957, 36 L.Ed.2d 752 (1973) ("great deference" to be accorded agency interpretation of a statute when that interpretation was contemporaneous with the statute and has been a consistent and longstanding one); 2 K. Davis, Administrative Law Treatise § 7:8, at 36–37 (2d ed. 1979) (courts give "special weight to interpretative rules . . . when [they] are within an agency's specialization or outside judicial competence, when rules are used contemporaneously with the statutory enactment, when rules are longstanding, and when rules are unchanged in a statutory reenactment").

own regulation and hold that any lesser weight that might otherwise be accorded that interpretation was dissipated by the agency's presentation to the Supreme Court of a contrary construction of the regulation and the resulting *Barlow's* dictum.

### 2. *Administrative Rulemaking*

 OSHA's labeling of the 1978 amendment to the regulation as an interpretative rule exempt from informal rulemaking was thought by the district court to be disingenuous, inasmuch as it "purported to overrule an inconsistent judicial ruling." 467 F.Supp. at 877, and that it was in fact a substantive rule because it would "'substantially affect[ ] the rights of those over whom the agency exercises authority.'" *Id.* at 880 (quoting *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1114 (D.C. Cir.1974)). The district court went so far as to characterize the agency's position—that its interpretation, rather than the statement of the Supreme Court or the conclusion tentatively reached by the district court in granting interlocutory relief, was binding—as a threat to the concept of separation of powers. *Id.* at 877–78.

The approach adopted by the district court, which has substantial support in the case law,[45] was to distinguish between interpretative and legislative rules and then to strike down the latter if found to be masquerading as the former. Under this method, the function of the court is to decide what a rule "really" does and then require a rule substantially affecting a legal right to be promulgated by notice-and-comment rulemaking or else be held invalid. The alternative approach used in *Daughters of Miriam Center for Aged v. Mathews,* 590 F.2d 1250, 1255 n.9, 1258–59 (3d Cir. 1978), is to take the agency at its word: If an agency that has the statutorily delegated power to issue legislative rules chooses instead to issue an interpretative rule, the court accepts that characterization of the rule but is free to arrive at its own interpretation.[46]

The difference between legislative and interpretative rules, as well as the corresponding variation in judicial review of them, has been articulated thus by the Court of Appeals for the District of Columbia Circuit: "The relevant distinction between legislative and interpretative or any other nonlegislative rules is not the nature of the questions they address but the authority and intent with which they are issued and the resulting effect on the power of a court to depart from the decision embodied in the rule." *Joseph v. United States Civil Service Commission,* 554 F.2d

---

45. *See, e. g., Pickus v. United States Bd. of Parole,* 507 F.2d 1107, 1112–14 (D.C.Cir.1974); *Detroit Edison Co. v. EPA,* 496 F.2d 244 (6th Cir. 1974); *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972); *cf. Joseph v. United States Civil Service Comm'n,* 554 F.2d 1140, 1153 (D.C.Cir.1977) (when agency clearly intended to exercise legislative rulemaking authority it cannot escape notice and comment requirement by subsequently arguing that the rule was interpretative). The method of the first three cases is criticized in 2 K. Davis, Administrative Law Treatise § 7:15, at 69–76 (2d ed. 1979).

46. *See* 2 K. Davis, Administrative Law Treatise § 7:10, at 54 (2d ed. 1979); Koch, *Public Procedures for the Promulgation of Interpretative Rules and General Statements of Policy,* 64 Geo.L.J. 1047, 1050–51 (1976) (footnotes omitted) ("Because interpretative rulemaking is usually an assumed power, it is appropriate that interpretative rules do not bind, but may persuade, a court in its exercise of judicial review. Thus, interpretative rules may be subject to de novo review, and courts are usually free to substitute their judgment for that of the agency.")

Neither of the two most recent Supreme Court cases on the subject are to the contrary. In *Ford Motor Credit Co. v. Milhollin,* —— U.S. ——, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), the Court deferred to a consistent, longstanding administrative interpretation of its own regulation and of the statute administered by the agency. Furthermore, the agency had "played a pivotal role in 'setting [the statutory] . . machinery in motion,'" and the matter interpreted was a "'highly technical'" one within the agency's expertise. *Id.* —— U.S. at ——, 100 S.Ct. at 797. In *Whirlpool Corp. v. Marshall,* —— U.S. ——, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980), the Court upheld an interpretative rule after examining the statute's "language, structure, and legislative history." In so doing, it cited the *Skidmore v. Swift & Co.* standard of deference. *Id.* at —— U.S. at ——, 100 S.Ct. 883.

1140, 1153 n. 24 (D.C.Cir.1977). "Legislative rules have the full force of law and are binding on a court subject only to review under an arbitrary and capricious standard. Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise." *Id.* at 1154 n. 26.[47]

OSHA has the delegated power to issue a legislative rule on the matter we are called upon to adjudicate [48] but chose not to. Taking its interpretative rule as such, we are then led back to our previous analysis of the appropriate standard of deference, or lack thereof, to OSHA's interpretation of its own regulation. For the reasons stated in that analysis, we reiterate that we shall follow the Supreme Court's statements in *Barlow's* rather than an agency construction that is not contemporaneous with the regulation interpreted, not consistent with the agency's prior interpretation, and therefore not longstanding.[49]

---

**47.** This treatment of interpretative rules appears to be consistent with congressional intent. *See* Senate Comm. on the Judiciary Administrative Procedure Act, Legislative History, S.Doc. No. 248, 79th Cong., 2d Sess. 18 (1945) (interpretative rules are subject to plenary judicial review).

The only Court of Appeals squarely to face the issue of the effect of the 1978 amendment of § 1903.4 seemed to conclude that because the amendment was validly promulgated as an interpretative rule, the court was bound to accept and apply the amendment's interpretation of the previous regulation. *See Marshall v. W & W Steel Co., Inc.,* 604 F.2d 1322, 1326 (10th Cir. 1979) (since amendment was an interpretative rule exempt from informal rulemaking, it "was effective and in force on the date when the warrant issued").

In a carefully considered opinion, the District Court of Maine held that the regulation does permit OSHA officials to seek *ex parte* warrants. *In re Worksite Inspection of S. D. Warren Div. of Scott Paper,* 481 F.Supp. 491 (D.Me. 1979). That decision rests on two crucial premises with which we do not agree: (1) the 1978 amendment is consistent with all previous agency interpretations of the regulation, *see id.* at 493–94; (2) the Supreme Court in *Barlow's* only "apparently" construed the regulation in a passing observation, *see id.* at 494. *See* notes 34 & 35 *supra.*

**48.** *See* 29 U.S.C. § 657(g)(2) (1976). Indeed, this authority was exercised in the original promulgation of 29 C.F.R. § 1903.4.

**49.** With the exception of *W & W Steel,* discussed in note 47 *supra,* all of the appellate cases cited by OSHA reveal, on close examination, not to have focused on the issue before us. In *Milliken & Co. v. Occupational Safety & Health Rev. Comm'n,* No. 77–1077 (4th Cir., filed Aug. 9, 1979) (unpublished), an employer challenged a citation on the ground that no valid consent to the inspection had occurred. The court held that an employer had consented to the inspection and rejected the contention that a coercive regulatory scheme precluded a finding that the consent was voluntary. In so doing, the court noted that the compulsory process referred to by the employer as part of the coercive scheme was precisely "the search warrant" the employer would require. The effect of *Barlow's* on the interpretation of § 1903.4 was not mentioned, and the case relied on for the interpretation of § 1903.4 was pre-*Barlow's. See Lake Butler Apparel Co. v. Sec'y of Labor,* 519 F.2d 84, 88 n. 14 (5th Cir. 1975) (cited in *Milliken & Co.,* typescript at 7).

In a case requiring exhaustion of administrative remedies prior to contesting OSHA's statutory jurisdiction, the Ninth Circuit remanded to the district court "with instructions to permit OSHA to file an *ex parte* petition for an inspection warrant." *Marshall v. Burlington Northern, Inc.,* 595 F.2d 511, 514 (9th Cir. 1979). The language quoted was added after the panel denied a petition for rehearing, *see Marshall v. Burlington Northern, Inc.,* 595 F.2d 511 (9th Cir. 1979), and § 1903.4 is not even mentioned, much less discussed. The language as to *ex parte* warrants was in no way related to the exhaustion issue argued and decided by the court.

Opinions of two other courts of appeals have also stated that lengthy, pre-inspection, adversary hearings were not the intention of Congress or of the Supreme Court. *See Marshall v. Shellcast Corp.,* 592 F.2d 1369, 1372 (5th Cir. 1979); *Marshall v. Gibson's Products, Inc. of Plano,* 584 F.2d 668 (5th Cir. 1978); *In re Establishment Inspection of Gilbert & Bennett Manuf. Co.,* 589 F.2d 1335, 1342 (7th Cir.) (limiting evidentiary showing of probable cause so as not to "turn a simple warrant request hearing into a full-blown hearing"), *cert. denied,* 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979). This is hardly surprising, since the Act purported to authorize inspections without a warrant or its equivalent. *See Marshall v. Barlow's, Inc.,* 436 U.S. at 325, 98 S.Ct. at 1827. In any event, the cases stand only for the inadvisability of lengthy adversary proceedings; they do not purport to decide the issue sub judice whether OSHA has empowered itself to avoid adversary process. *See Marshall v. Shellcast Corp.,* 592 F.2d at 1370 n. 3 (as in *Gibson's,* the

## V.

The judgment of the district court will be affirmed.

SEITZ, Chief Judge, dissenting.

Unlike the majority, in my view the original version of § 1903.4 that controls this case permitted ex parte warrants. Thus both injunctions here were improper because there was no reasonable probability of eventual success on the merits.[1]

I agree with the majority that OSHA's practice in obtaining warrants has alternated between ex parte process and adversarial process. Nevertheless, the agency's prior practices must not obscure the real question of whether § 1903.4 permits ex parte warrants. Even if I were to conclude that the agency's prior interpretations of the regulation are not entitled to deference, that does not necessarily mean that the court should automatically accept the view contrary to the agency's present interpretation. Rather, a decision of "no deference" requires a court to engage in an independent evaluation of the merits.

I start with the proposition that the phrase "compulsory process" in § 1903.4 is certainly broad enough to encompass ex parte warrants. Indeed, the ordinary meaning of that phrase includes ex parte warrants. Thus the question is whether any of the factors present here is sufficient to overcome the ordinary connotation of the phrase "compulsory process."

First, the parties have provided us with numerous individual cases concerning OSHA's enforcement practice where either ex parte or adversary process has been used. The fact that OSHA has used both methods in no way implies that only one is proper.

Second, much reliance has been placed on the OSHA field manuals to show what OSHA intended "compulsory process" to mean. Because the controversy centers mainly on the 1976 version of the manual, it is important to examine the historical development of the manuals.

In the original 1972 version of the manual, the part of the manual dealing with inspections that is denoted 2(a) stated that the inspector should first ask the owner permission to inspect. If the owner refused, 2(b) required the inspector to inform his superiors and "request that an inspection warrant be obtained." Under 2(f), if refusal was to be expected, the inspector need not first ask permission but instead "a warrant should be obtained before the inspection is attempted." 2(i) stated: "Except in unusual circumstances . . . , there shall be no advance warning to the employer of the fact either that a warrant has been secured or that inspection will take place pursuant to the warrant." Given that advance notice of the agency's intent to secure a warrant is one of the essential elements of adversary process, it would seem that 2(i) contemplated use of ex parte warrants because advance warning of the agency's intent would be given only in "exceptional circumstances."

Thus the 1972 manual draws a crucial distinction between asking the owner's permission to inspect and giving the owner advance notice that the agency intends to secure a warrant. The manual established two types of inspections: those where the owner is asked permission first and those where he is not. Under both types of inspections, a warrant may be necessary (always in the second type and only if the employer refuses in the first type). Because 2(i) applied to both types of inspec-

---

court does not reach the question of federal jurisdiction to issue *ex parte* inspection warrant); *In re Establishment Inspection of Gilbert & Bennett Manuf. Co.*, 589 F.2d at 1342 (discussion restricted to amount of proof required to establish probable cause for inspection).

1. I agree with the majority that the result in the two cases before us ought to be the same. If the original regulation permitted ex parte war-

rants, then the December 22 addition of subparagraph (d) is properly characterized as an interpretive ruling that does not require notice and comment procedures. On the other hand, if the original regulation did not permit ex parte warrants, then the addition of subparagraph (d) is a significant enough change to require notice and comment no matter which of the various tests cited by the parties is used.

tions, the employer usually would not receive advance warning of the fact that a warrant was being secured. Thus the 1972 manual anticipated ex parte warrants whether or not the inspector first asked the owner for permission to inspect.

By 1976, two changes were made in the manual. First, the phrase "compulsory process" was substituted for the word "warrant." By use of the broader phrase it can hardly be said that the more specific term was meant to be excluded.

Second, 2(f) of the 1972 manual—which dealt with the case where the inspector did not have to ask the owner's permission first—was dropped. 2(a) and 2(b) were renumbered but retained in substantially their 1972 form, which required the inspector to first ask the owner's permission and then seek "compulsory process." Most significant, subparagraph (8) of the 1976 manual retained the phrase in 2(i) of the 1972 manual that "[e]xcept in unusual circumstances . . . , there shall be no advance notice to the employer concerning compulsory process or pending inspection."

Seen in light of the previous distinction between asking the owner's permission and giving him notice of the intent to secure a warrant, the 1976 manual does not have the significance attributed to it by the majority. The dropping of 2(f) means only that the inspector always must first ask the owner's permission prior to inspection. The retention of 2(i) in subparagraph (8), however, means that the manual still contemplated ex parte warrants once the owner refused permission. In effect, by 1976, OSHA had abandoned the bifurcated scheme of inspections in the 1972 manual in favor of a scheme whereby the owner's permission was always sought first. That in no sense diminishes the fact that the 1976 manual, just like the 1972 manual, contemplated that upon refusal, an ex parte warrant would be proper.

I do not believe that the dropping of 2(f) is sufficient to overcome the ordinary meaning of "compulsory process." If anything, the retention of 2(i) in subparagraph (8) leads me to the opposite conclusion.

Finally, the majority relies heavily on a passage in *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Even if this dictum was "integral" to the Court's holding, "[i]t is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (Wheat.) 264, 399, 5 L.Ed. 257 (1821). Taking the Court's remarks in the context of that particular case, I do not believe they are controlling.

As the majority correctly notes, OSHA's position in *Barlow's* concerning ex parte warrants was a litigation strategy. Indeed, the dropping of 2(f) from the manual was part and parcel of that strategy. OSHA began requiring that the inspector always ask the owner's permission first, instead of permitting some inspections without such asking as did the 1972 manual, as part of its strategy to contend that warrants were never required. But as with any intelligent litigation strategy, the wise strategist must realize that he might lose. Thus the retention of 2(i) in the 1976 manual represents a fall-back position in case warrants were required. In effect, OSHA required the inspectors to always ask for permission first because it thought warrants were not required, but hedged its bets by retaining language in subparagraph (8) that authorized ex parte warrants.

Viewed in light of this litigation strategy, the Supreme Court's language makes sense. All that the Court referred to was the dropping of 2(f); it nowhere mentioned subparagraph (8). *See* 436 U.S. at 318 n. 13, 98 S.Ct. at 1823. This is quite natural: only the dropping of 2(f) was relevant to OSHA's contention in *Barlow's* that warrantless searches were proper. The Court probably did not refer to subparagraph (8) because that was the fall-back position and was not directly relevant to the litigation strategy embodied in the dropping of 2(f). Moreover, given our duty to examine all of the facts relevant to issues directly presented, it would be a grave disservice to the parties to fail to independently examine the

manuals here, especially where all of the facts were not directly relevant to the litigation strategy in *Barlow's*.

In short, I find nothing here to overcome the ordinary meaning of the phrase "compulsory process." OSHA's uneven enforcement provides little guidance. As to the enforcement manuals, the abandonment of the 1972 bifurcated inspection scheme but retention of language in the manual in subparagraph (8) supports the ordinary meaning of § 1903.4. Finally, I do not find language in *Barlow's* responding to a very specific litigation strategy to be controlling. Accordingly, I would reverse the judgment of the district court.